## ASHLEY v. BOARD OF SUPERVISORS OF PRESQUE ISLE COUNTY.

(Circuit Court of Appeals, Sixth Circuit. December 9, 1893.)

### No. 116.

1. COUNTIES—BONDS.

Certain bonds were regularly issued by the board of supervisors November 1, 1871, and the proceeds applied to the erection of county buildings. The organization of the county had been authorized March 31, 1871, at which time it contained but one township, but a second township was created July 29, 1871, by the board of supervisors of the county to which it had been attached as an unorganized county. The supreme court having ruled (People v. Maynard, 15 Mich. 463) that there could be no valid organization of a county containing but one township, an act was passed (April 9, 1875) under which the county, in form at least, was newly organized. *Held*, that the act March 31, 1871, was provisional, and not void upon its face; that it would be presumed that the organization of the county was subsequent to the organization of the second township; that the question of the legal existence of the county could not now be raised, in a private litigation; that the act of April 9, 1875, could not operate to divest rights which had been acquired while the county was exercising the power it had assumed; and that, therefore, in view of all the circumstances, the bonds issued in 1871 were valid.

2. SAME—REFUNDING BONDS—NOTICE TO PURCHASER.

Refunding bonds, payable to bearer, recited that they were issued by the board of supervisors in conformity with the provision of an act authorizing the county to issue such bonds and provide for the retirement of outstanding bonds. *Held*, that the purchaser was not bound, in the face of the recitals borne by the bonds, to investigate the nature of the refunded indebtedness.

3. SAME—BONDS NEGOTIABLE IN FORM.

Statutory authority to issue and market bonds, which are to run for a long period of time and bear interest, *held* to authorize, by implication, bonds negotiable in form.

4. CIRCUIT COURT OF APPEALS—JURISDICTION—PRACTICE.

The circuit court of appeals will, upon writ of error, remand a case, with directions that it be dismissed, when it appears that such case has been brought within the jurisdiction by means of collusion; but to

justify such action the proof must be clear and unequivocal; otherwise, if the question has not been passed upon by the court below, the court of appeals, on reversing the judgment, will direct the trial and determination of that matter at the circuit.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This was an action brought by William J. Ashley against the board of supervisors of the county of Presque Isle to recover upon certain county bonds and coupons. The court below directed a verdict for defendant, and entered judgment accordingly, and plaintiff brought the case, on error, to this court.

In this case the plaintiff sued to recover upon bonds Nos. 5 and 6, and several interest coupons belonging to those and other numbered bonds in the same series, being part of an issue of 18 bonds for the sum of $1,000 each, with coupons for interest in the usual form, made by the county of Presque Isle on the 26th day of March, 1885. The bonds were payable to the bearer, and carried interest at the rate of 7 per cent., payable annually, according to the terms of the coupons.

In addition to special counts, the declaration contained the common counts; and there were appended copies of the obligations sued upon, together with a notice that they would be given in evidence under the money counts. This was in accordance with the practice in the courts of the state. The defendant pleaded the general issue. The case went to trial before a jury, and under an instruction by the court, at the conclusion of the evidence, that the supposed obligations were void, as matter of law, a verdict was returned for the defendant, and judgment was entered accordingly. The facts necessary to a proper understanding of the case may be stated as follows:

Prior to March 31, 1871, the county of Presque Isle was one of the unorganized counties of Michigan, and was attached to the organized county of Alpena for judicial and municipal purposes. On that day an act was passed by the legislature of the state providing for its organization with the same territory which it had previously embraced, and with the powers and privileges common to the other counties of the state. Provision was made for the election of the usual county officers, fixing the county seat, for a seal and proper record books, and for the holding of courts. The date fixed for the election of officers, which was the first step in organization, was the first Monday in April following; but it was further provided, by section 5 of the act, that, 'n the event that the election should not be held at the date named, it might be held at any time thereafter, upon giving the prescribed notice.

At the date of this act there was but one township in the county, namely, the township of Rogers, On the 29th day of July, 1871, the board of supervisors of the county of Alpena, under the authority conferred by general statutes, organized another township in Presque Isle county, by the name of Presque Isle.

At some time prior to September 16, 1871,—but on what date does not appear from anything in the record,—the election contemplated by the above-mentioned act took place; and it is shown that on the said 16th day of September there were two township supervisors, one for each of the townships of Rogers and Presque Isle, who assumed to act as such in their respective townships.

Upon the organization of the county under the act of March 31, 1871, it assumed the functions of an organized county, under the constitution and laws of the state, and continued to exercise them. It was recognized as such by various officials of the state, and dealt with as such in departmental business; and on March 28, 1873, the legislature passed an act to organize three counties, and to add certain territory to three other counties,—among them, Presque Isle. The language of the fourth section of that act was this: "That township number 37, north of range number 2, east, is hereby attached to the organized county of Presque Isle." In the progress of events,

questions arose as to the validity of the act of 1871, under which the organization of the county had taken place, in view, probably, of the ruling of the supreme court of the state in People v. Maynard, 15 Mich. 463, that there could be no valid organization of a county having but one organized township within its limits, and so no sufficient material for making up a board of supervisors to execute the functions of a county. And on the 9th day of April, 1875, an act was passed by the legislature entitled an "Act to organize the county of Presque Isle, and the townships of Presque Isle, Posen, Belknap, Rogers and Moltke," in that county. This act, in accordance with the scope of its title, purported to organize the territory of the then county of Presque Isle into a county of that name, and to subdivide the whole thereof into the organized townships above named, and provided a detail of proceedings for organization of county and townships. Such proceedings were had, and the county, in form, at least, was newly organized.

Recurring to the original organization of Presque Isle county in 1871, the record shows that, having no courthouse or county jail, the then board of supervisors, consisting of the supervisors from the townships of Rogers and Presque Isle,—the county clerk, the proper officer for that purpose, attending, —passed a resolution declaring it was necessary to raise $9,000 for building a courthouse and $6,000 for building a jail, and providing for the submission to the electors of the county of the question whether these sums should be raised by loan for those purposes. On the 21st of September the clerk issued the notice for an election on the 23d day of October following, and on the last-mentioned day the electors voted, in their several townships last named, on the question submitted. On the succeeding day the votes were canvassed by the proper officers, and it was found and declared by the proper canvassing board that a majority had voted in the affirmative. Shortly thereafter the board of supervisors again convened, and resolved to issue 30 10 per cent. bonds, of $500 each, in pursuance of the vote of the electors, and to provide a sinking fund to liquidate the loan, setting apart yearly for that purpose the sum of $1,000 from the sum raised by taxation for county purposes.

Thirty bonds were issued November 1, 1871, in the sum of $500 each, payable to bearer, with interest at 10 per cent., payable annually on presentation of the coupons attached. They were in the usual form of such bonds, stated the purpose of their issue, and represented that they were "issued in conformity with chapter 10 of the Compiled Laws of the State of Michigan, and authorized by a legal vote of the qualified voters of the county at a special election held in said county on the 23d day of October, 1871." They were signed by the chairman of the board of supervisors and the treasurer of the county. The bonds were sold for their full face value, and the money received for them was used in the building of a courthouse and jail, which the county occupied thereafter for the holding of the state circuit court, and for county offices and all the purposes to which such buildings are usually appropriated. These bonds passed into the hands of purchasers, bona fide and for value, before maturity.

On March 17, 1875, the Brunswick Savings Institution, of Brunswick, in Maine, being the holder of a considerable portion of the bonds, brought suit in the circuit court of the United States for the eastern district of Michigan upon 34 of the coupons. Judgment by default was rendered thereon May 1st, following. In March, 1878, a motion was made to set the judgment aside, and for leave to defend. The principal ground of the motion was that the county of Presque Isle had no lawful existence when the bonds were issued, and that they were void. The motion was overruled, but for what reasons does not expressly appear. In July, 1878, a mandamus was issued, requiring the board of supervisors to spread a tax upon the tax rolls of the county to pay the judgment. The judgment was paid in October, 1879. On November 21, 1878, another suit by the same plaintiff was brought in the same court against the county on 64 other coupons. Judgment for the plaintiff was rendered thereon in 1879, and was paid. In February, 1875, one Collingwood brought suit against the county in the same court upon warrants of the county issued in the years 1871-72-73. There were the like proceedings to the rendition of the judgment for the plaintiff, and for the collection thereof,

as in the first of the above suits of the savings institution. All these judgments were subsequently purchased by George J. Robinson, who also became the holder, for himself or others, of many or all of the bonds which had been issued as above stated.

Records of the judgments were offered in evidence upon the trial of the present case. Upon an objection that there was no county of Presque Isle at the date of the alleged service of process in those cases, they were excluded. Upon this exclusion the plaintiff tendered an exception, and now assigns error.

After the rendition of those judgments, and in December, 1884, the board of supervisors of the county passed a resolution that they deemed it expedient to provide for the retiring of the outstanding county bonds by a new issue of bonds bearing a less rate of interest, and running over a series of years, to give the taxpayers time to meet the payment, and appointed a committee to procure an act of the legislature permitting the board to issue such new bonds. Responding to this, the legislature passed an act, on February 16, 1885, empowering the board of supervisors to issue bonds upon the faith and credit of the county, and to provide for the payment of the same by tax upon the county; and it was provided in the act that the bonds to be issued might be exchanged at their par value for the outstanding bonds, or be sold at not less than their par value, and imposed upon the county treasurer the duty of applying the new bonds and the proceeds thereof to the payment and retiring of the outstanding bonds and the interest thereon, and to no other purpose. There was no evidence that there were any other bonds of the county outstanding, except those already referred to as issued in 1871.

On the 25th day of March, following, the board of supervisors passed a resolution reciting that the amount of outstanding bonds, with interest, was about the sum of $18,000; that the same was about to fall due; that it would be easier for the taxpayers to make a new arrangement, which had been satisfactorily agreed upon, for the retiring of the bonds,—and declaring that by the authority and in pursuance of the act of February 16, 1885, the board thereby authorized and directed the issue of coupon-bearing county bonds in the sum of $18,000, $1,000 of which should become due in each of the 18 years beginning with 1887. The bonds and coupons were to be payable at the Wayne County Savings Bank, in Detroit, and the rate of interest to be 7 per cent., payable annually. And the resolution further declared that it should be the duty of the chairman of the board and the county treasurer to sign and execute said bonds and coupons, and it should be the duty of the county treasurer to apply such bonds, at their par value, to the payment, retirement, and cancellation of the bonds of the county theretofore issued and then outstanding, and the interest due thereon, and for that purpose the county treasurer should call in said outstanding bonds, by exchanging or paying therefor the bonds thereby authorized.

On the next day, in pursuance of, and in accordance with, the above resolution, 18 $1,000 bonds, with interest coupons attached, were issued, having been signed by the chairman of the board and county treasurer. Each of them was made payable to bearer, and recited that: "This bond is issued in conformity with the provisions of an act entitled, 'An act to authorize the county of Presque Isle to issue bonds and to provide for the retirement of outstanding bonds,' approved February 16th, 1885, and authorized at a meeting of the board of supervisors of said county of Presque Isle, March 25th, 1885." All of this issue of bonds was delivered to Robinson in exchange for the bonds of the former issue, which he then held, and which were claimed by him to be valid obligations of the county. The latter were delivered up to the county treasurer, and were then destroyed.

Those of the new bonds and coupons first maturing were paid, but the evidence tended to show that Robinson sold the 14 bonds last maturing, with the coupons not yet due, to the Wayne County Savings Bank, before the maturity of the bonds, for full par value, and without any notice on the part of the bank of any infirmity therein. Subsequently the bank transferred those of the bonds and coupons now in suit to John R. Whitbeck, of Rochester, N. Y., by whom they were transferred to the plaintiff, who also resided at Rochester. Upon the trial the defendant introduced the depo-

·sitions of Whitbeck and Ashley, which had been taken, apparently, for the purpose of showing that the transfers ,to them were not bona fide, but were made for the purpose of constituting a fictitious plaintiff to bring suit in the United States court. Considerable evidence was introduced on both sides on the question of the good faith of those transfers. The court, however, did not pass upon it, nor submit it to the jury, for the reason, as was stated, that it was not deemed material, the court being of the opinion that the obligations involved in the suit were invalid, because they were issued in violation of the constitutional requirement that expenditures of more than a thousand dollars in any one year should first be sanctioned by a vote of the electors of the county. The court further held that it was precluded from treating the original bonds as valid by the decision of the supreme court of the state in Pack v. Supervisors, 36 Mich. 377, and therefore directed a verdict for the defendant.

Levi T. Griffin and Carlos E. Warner, for plaintiff in error. ·

Henry M. Duffield, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

SEVERENS, District Judge, (after stating the facts.)    In regard to the question of the validity of the bonds of Presque Isle county, issued in 1871, the court appears to have held that it was precluded by the decision of the supreme court of Michigan in the case of Pack v. Supervisors, 36 Mich. 377, which was supposed to have held that there was no organized county of Presque Isle at the time when those bonds were issued; and, inasmuch as the question of the proposed expenditure was in fact submitted to the electors before the bonds were issued, the ruling of the court below must be construed as recognizing the case referred to as a conclusive adjudication that the county of Presque Isle had no lawful existence in 1871, and therefore had no power to issue such bonds.

We are unable, however, to find in that decision any warrant for giving it so wide a scope. That case arose upon a petition for a mandamus against the supervisors to compel them to provide by taxation for the payment of certain county warrants issued in 1874 and January, 1875, nominally to one Boggs, who was the agent of the relator; the latter being the party in interest, and having knowledge of all the facts relating to their issue. The answer, which was taken as true, denied that there had been any legal organization of the county prior to the act of April, 1875, and assigned reasons for that conclusion. It then proceeded to state the nature of the proceedings upon which the warrants were issued, namely: That the supervisors of the county held a meeting at Crawford's Quarry,— not the county seat,—where it was declared expedient to remove the county seat to the former place, and it was resolved to submit the question of the removal to the electors of the county. That meeting was averred to have been illegal, and without notice to the county clerk, who was not present. The warrants in question, amounting to $2,740, were issued, all within seven months, upon a contract for the erection of county buildings. That the question of raising money was never submitted to a popular vote, as required by law where more than $1,000 was proposed to be raised for building

purposes. That no notice was given of the place to which it was proposed to remove the county seat, which is especially required by law when the vote of the electors is taken. And that there were no orders or resolutions authorizing the issue of the warrants.

The supreme court in its opinion, having recited these facts, said:

"Under these circumstances, we are not disposed to discuss the question when the county of Presque Isle was organized, or to enter upon the other questions concerning the townships. A mandamus will not issue to enforce any doubtful right. The answer, for the purpose of the present controversy, is taken as true; and, if true, it shows that these warrants were issued without authority, to a party having notice of their invalidity, and for a purpose which was illegal. It cannot be claimed, as this record stands, that the county buildings were lawfully contracted for, nor that the county seat had been removed, if the county itself was in existence. There has been no legislative recognition of removal, and, even if lawfully removed, the contract for buildings for more than one thousand dollars was unauthorized. Acting upon this answer, as admitted, we must deny the mandamus."

It is manifest that the court declined to go into the discussion of the lawful organization of the county, and rested its decision upon the character of the proceedings under review, without regard to the fundamental question whether the county had been duly organized or not. It is equally manifest, we think, that, when the court say that those "warrants were issued without authority," they refer, not to any want of authority deduced from the consideration of a matter they had expressly refused to consider, but to the defects in the proceedings which they immediately point out. We have given a full analysis of this case, for the reason that it seems to have controlled the action of the circuit court. We conclude that the effect of the decision was misapprehended, and that it does not conclude the question of the lawful authority of Presque Isle county to issue the bonds of November 1, 1871.

But we are required to consider whether the direction given by the court was right, notwithstanding our opinion that the reason given for it was wrong. The proposition insisted upon by counsel is, in the first place, that the statute of March 31, 1871, providing for the organization of Presque Isle county, was unconstitutional and void, because there was but a single organized township within its limits, and therefore there could not be constituted a board of supervisors,— a prime necessity for the exercise of county functions,—and also because it left some of the inhabitants of the county without an opportunity of voting upon questions affecting their interests; and the case of People v. Maynard, 15 Mich. 463, (a case which will be discussed in another place,) is cited in support of this proposition. That case does undoubtedly hold that there can be no regular organization of a county, in such conditions; and in that case, where steps were immediately taken after the passage of the act to test the validity of the organization upon a writ of quo warranto by the attorney general to try the right of one assuming to be a public officer in the territory affected by the decision, it was held that the organization was not lawful.

The act of March 31, 1871, was provisional only. It was, in substance, an enabling act. It did not, ipso facto, organize the county.

The county continued attached to Alpena county for judicial and municipal purposes as before, until its organization should be completed. It was not shorn off, and left an independent county, without government, in the mean time. The time within which the organization might take place was left indefinite by the statute. The validity of the law must depend upon the test whether, when it becomes operative, it infringes upon some provision of the constitution. Legislation in prescribed methods is not to be held void unless its operation and effect result in consequences which are forbidden by the supreme law. The law in question was not void upon its face, and would only prove to be so when applied to the subject-matter. Cooley, Const. Lim. 163, 164; Golden v. Prince, 3 Wash. C. C. 313, Fed. Cas. No. 5,509.

We do not see that it was shown in the court below whether the organization of the county under the act of 1871 took place before or after the organization of the township of Presque Isle. If after, there was then a sufficient number of supervisors to constitute a board, and there is nothing in the record to show that there were in fact any inhabitants outside of the two townships who were entitled to vote. Acting upon the rule of the maxim, "Omnia praesumuntur rite esse acta,"—a rule peculiarly applicable to this class of questions,—we ought to presume, in the absence of evidence to the contrary, that the facts necessary to the legal organization of the county existed, and, therefore, that there were in the county two organized townships, and that there were no obstacles, arising from any cause. A like presumption was made in Rice v. Ruddiman, 10 Mich. 125, 135, in support of the validity of the organization of the county of Muskegon.

But inasmuch as it may appear, upon a new trial, that the organization of the county of Presque Isle took place while there was yet but one township in it, or under other disabling conditions, it seems necessary to consider the case upon that aspect. Assuming that under the doctrine of People v. Maynard, above referred to, the courts of the United States would be bound to hold that such organization was unlawful and void in its inception, it does not, in our opinion, follow that if the county, assuming it to be valid, went on as such, acquired the capacity to be a county, and exercised for years, with the acquiescence of the state government, the functions and privileges of a county, its status and the validity of its acts are to be tested by such rules as would have been applicable in a direct and prompt challenge by the state when those powers and privileges were assumed. In the latter case, the public interests are best subserved by speedy reformation, and no private interest is harmed. In the former, the public interests have been adjusted to the actual condition of things, and private interests have become settled upon the foundations which local authority has laid, with the consent of the state, whose business it was to interfere and prevent the mischief, if any such were feared. It is a matter peculiarly within the province and duty of the state to watch over and prevent the development of political

growths which are likely to be prejudicial to the public interests. When it does not interfere, private individuals are justified in assuming that there is nothing obnoxious in the organization, and that they may treat with it in the character it has assumed.

In the case of a county, after it has gone on for years as such, taxes have been levied and collected under its authority; deeds and mortgages have been registered in its records, and titles have been gained or lost by such registration; the estates of deceased persons have been settled and distributed by its court of probate; the rights of parties have been adjudicated, and remedies awarded, by the circuit court, in sessions at its county seat, and accused persons have been tried, convicted, and sentenced to imprisonment by that court. We do not know that, in this instance, all these particular incidents have happened, but it is reasonable to suppose all may have occurred, and many others of kindred character.

May the foundation on which all these things rest for their security or authority be repudiated and denied by the municipality which assumed the character, has been allowed to act in it, and, agreeably to the law governing it in that character, has pledged its faith to repay what it has received and applied to its advantage, and thus disappoint the expectations of those who have trusted in its representations?

In the case of People v. Maynard, a question arose upon the act of February 10, 1857, providing for the organization of the township of Teal Lake. It was suggested to the supreme court that the law was unconstitutional, and therefore void, because, as it was claimed, no such purpose could be connected with the title of the act, which, under the constitution, must indicate the single object to be provided for. But the suggestion was rejected, the court saying:

"If this question had been raised immediately, we are not prepared to say that it would have been altogether free from difficulty. But inasmuch as the arrangement there indicated had been acted upon for ten years before the recent legislation, and had been recognized as valid by all parties interested, it cannot now be disturbed. Even in private associations, the acts of parties interested may often estop them from relying on legal objections which might have availed them if not waived. But in public affairs, where the people have organized themselves, under color of law, into the ordinary municipal bodies, and have gone on, year after year, raising taxes, making improvements, and exercising their usual franchises, their rights are properly regarded as depending quite as much on acquiescence as on the regularity of their origin, and no ex post facto inquiry can be permitted to undo their corporate existence. Whatever may be the rights of individuals before such general acquiescence, the corporate standing of the community can be no longer open to question. See Rumsey v. People, 19 N. Y. 41, and Lanning v. Carpenter, 20 N. Y. 447, where the effect of the invalidity of an original county organization is very well considered, in its public and private bearings."

In Clement v. Everest, 29 Mich. 19, a bill was filed to restrain the collection by the township collector of school taxes in district No. 3 of the township, and it was alleged that the lands on which the taxes were assessed had been detached from that district, and attached to No. 2. One of the grounds of defense was that the

action of the township board of school inspectors in detaching those lands, which had been recently done, was unlawful, for reasons set forth in the answer. In dealing with that objection, the court say:

"It would be dangerous and wrong to permit the existence of municipalities to depend on the result of private litigation. Irregularities are common and unavoidable in the organization of such bodies, and both law and policy require that they should not be disturbed, except by some direct process authorized by law, and then only for grave reasons." "In such matters as concern the public, and do not interfere with private property or liberty, such action as creates municipal bodies and gives them corporate existence cannot be questioned without creating serious disturbance."

This doctrine is approved and applied in the case of Stuart v. School Dist., 30 Mich. 69, where a bill was filed to restrain the collection of taxes which had been assessed for the support of a high school in the district. Only certain districts, which were specially constituted, were authorized to do this, and it was claimed that the special act which had been passed for the benefit of this district was void for the want of compliance with the constitution in the form of its enactment. But, the district having proceeded for a number of years to exercise the powers attempted to be conferred, the court said they would wholly decline to consider the objection.

Recurring to the case of People v. Maynard, it will be seen that the reason for the decision was drawn from the implications of the constitution in regard to the formation of counties. But if the constitution had expressly declared the requirements and the method to be pursued, the fact would remain that the organization which the county had taken on under color of the statute, and in the form of which it acted without question by the state, could not be attacked collaterally. Cooley, Const. Lim. 254; City of St. Louis v. Shields, 62 Mo. 247.

In State v. Rich, 20 Mo. 393, a motion was made to quash an indictment found in the circuit court for Stone county, upon the ground that the statute establishing that county was unconstitutional, in that it reduced Taney county, from which the new county was taken, below the ratio of representation required, and therefore that Stone county was not constitutionally established. It was held that while the court did not intend to raise a doubt of the correctness of a decision previously made that the legislature could not reduce an old county in that way, yet the validity of such an act could not be drawn in question in this way, but only in a direct proceeding for the purpose of testing the validity of the organization of the county.

But it is needless to multiply authorities. They are substantially, if not altogether, agreed upon the proposition that when a municipal body has assumed, under color of authority, and exercised for any considerable period of time, with the consent of the state, the powers of a public corporation of a kind recognized by the organic law, neither the corporation nor any private party can, in private litigation, question the legality of its existence.

But counsel for the defendant lays principal stress upon the doctrine that there cannot be a county de facto where there can be none de jure; and it is argued that because the law of 1871 was void when enacted, and gave no authority for organization, there was no law under which Presque Isle county could become de jure a county, and therefore it could not become de facto such. The general proposition is no doubt correct, as a statement of a doctrine of law. But we do not think that proposition, as applied to the case before us, is sound. We doubt whether the premise of the proposition founded on it is true. We have already given some reasons for thinking it is not. But we also think the premise is insufficient. The supreme law of the state recognizes counties as political bodies corporate. Their existence is not only permitted, but is essential to the government which is organized. Their corporate character is not given by the legislature. That body, if it deems the organization consistent with public policy, prescribes a method of organization in form. This law, whether operative or not, signified the approval of the legislature of the formation of the new county, and in so far was in execution of its authority under the constitution; and we apprehend the rule to be that an unconstitutional and void law may yet be color of authority to support, as against anybody but the state, a public or private corporation de facto, where such corporation is of a kind which is recognized by, and its existence is consistent with, the paramount law, and the general system of law in the state.

In the case of State v. Carroll, 38 Conn. 449, it was held that an unconstitutional law constituted a valid support to official action performed under it before the law had been authoritatively pronounced void. And in the case of Donough v. Dewey, 82 Mich. 309, 46 N. W. 782, that doctrine was affirmed, and applied to a case where the legislature had passed a law for the election of a second township school inspector, in the face of the constitutional provision that there should be but one. Under that law the township elected a second inspector, and she was a woman. The validity of the action of the board of which she was a member being called in question, the court held that the rule that there could be no de facto officer where there was no de jure office was modified by the further rule that an office created by the legislature must be deemed one de jure, so long as the law is treated by the public as valid, though it should afterwards be held otherwise; and, applying that rule, the court held the proceedings valid. This case declaring the rule in Michigan, which is applicable to the construction and efficacy of its statutes, in furtherance of its local policy, if not binding upon us, is yet entitled to very high respect and consideration.

Much reliance was placed in argument upon the case of Norton v. Shelby Co., 118 U. S. 426, 6 Sup. Ct. 1121, as supporting the application of the rule invoked to the present case. But an examination will show that it does not declare or indicate anything inconsistent with the views above stated. It was an action against the county upon certain bonds which had been issued in its name by a board of county commissioners. This board had been created by a special

act of the legislature of Tennessee, and empowered to execute the duties which, by the constitution of the state, were devolved upon the county court, composed of the justices of the peace of the county. Within a month after its passage the justices of the peace assailed the validity of the act by filing a bill in their official character, in the name of the state, against the commissioners, charging them with unlawful usurpation of the power of the justices, and praying that they should be enjoined. The case went to the supreme court of the state, where it was held that the act was void. This was in conformity with a decision which had already been made by that court in another case of the same kind from the same county. The board of commissioners was a body not known to the constitution of the state, and was an anomaly in its system of administration of county affairs. For the plaintiff it was contended, in the case of Norton v. Shelby Co., that, although the commissioners did not hold their offices de jure, they were nevertheless officers de facto, and, being such, their acts were valid. The supreme court held otherwise, upon the ground that the commissioners could not be incumbents of an office which could not exist. They could not fill a place which was unknown to the constitution of the state, and which was made in the room of a board expressly authorized by that instrument to discharge the duties of the same office. And the court took pains to distinguish such a case by saying, at page 441, 118 U. S., and page 1125, 6 Sup. Ct.:

"The doctrine which gives validity to acts of officers de facto, whatever defects there may be in the legality of their appointment or election, is founded upon considerations of policy, and necessity for the protection of the public and individuals whose interests may be affected thereby. Officers are created for the benefit of the public, and private parties are not permitted to inquire into the title of persons clothed with the evidences of such officers, and in apparent possession of their powers and functions. For the good and peace of society, their authority is to be respected and obeyed until, in some regular mode prescribed by law, their title is investigated and determined. It is manifest that endless confusion would result, if, in every proceeding before such officers, their title could be called in question. But the idea of an officer implies the existence of an office which he holds."

And the court distinguishes the case of State v. Carroll, supra, which is cited with apparent approbation, by the test which it had indicated, and by pointing out that in that case there was an office to fill. Similar reasons and the like rule apply in the case of officers as to that of municipal corporations de facto. Clement v. Everest, supra.

On March 28, 1873, the legislature passed a special act attaching township 37 north, 2 east, "to the organized county of Presque Isle." It is said that this act cannot be held to be a legislative recognition of the county's previous organization, because, as is argued, that act was itself unconstitutional, in that, by its title, it had more than one object. We are not prepared to admit that the statute would not have the effect of a legislative recognition, even if it was invalid for the reason stated; but as we are of the opinion that the validity of the original organization of the county cannot be, by itself, assailed in this collateral way, we do not deem it necessary to decide

whether the statute of 1873 was valid or not, or, if invalid, whether it would still operate as a recognition of what had been done.

We do not construe the act of April 9, 1875, as in any sense a repudiation of the original organization. Doubts had arisen in regard to its legality. The public interests required that those doubts should be put at rest, and the legislature proceeded to clothe the county with an unquestionable title. Having regard to what had transpired, it would seem that this statute should be regarded as effecting a reorganization, and giving express sanction for the continuance of a body whose origin was clouded with doubts of its lawfulness. However that might be, the statute could not, upon any construction, operate to divest rights which had been acquired while the county was exercising the powers it had assumed. We are therefore of the opinion that, upon the facts presented by this record, the bonds issued in 1871 were valid.

But, if this were not so, we should still think, in the circumstances of this case, that the bonds issued in 1885 to refund the supposed indebtedness are binding obligations upon the county. The former bonds were more than colorable obligations. Recoveries had been had in the United States circuit court against the reorganized county upon some of them, and the validity of the remaining ones was, to say the least, a fair question for controversy. The county chose not to make further defense to the bonds, and to avail itself of the opportunity to defer the payment of the indebtedness, and to obtain a reduction of the interest from 10 to 7 per cent. It sought and obtained from the legislature authority to refund its debt. It procured the surrender of the former bonds, and issued in their stead, and in consideration of them, the new bonds. If the legislature did not assume the former bonds to be valid, it devolved upon the board of supervisors of the county to determine what were valid obligations of the county, in exercising the authority to issue the new bonds conferred by the act, and such determination would bind the county.

In the case of City of Cadillac v. Woonsocket Institution, (argued at the same term with this, and recently decided,) 58 Fed. 935,[1] bonds had been issued, under the guise of a loan authorizing public improvements, for the actual purpose of aiding a railroad company. The bonds were in the hands of one who knew of the fraudulent evasion of the constitution of the state, and no action could have been maintained upon them by him. But they were negotiable, and might have been put upon the market by him. In this state of affairs, the common council of the city, upon the request of a large number of its citizens, and upon considerations deemed by the council to justify it, issued new bonds to take up the former ones under the provisions of the Michigan statute for refunding municipal indebtedness. The new bonds were exchanged for the old, and passed into the hands of bona fide holders, who brought suit upon them. One question involved in the case was whether a buyer of the bonds—which, on their face, were re-

---

[1] 7 C. C. A. 574.

funding bonds—was bound to go back of the issue of the new bonds, which were regular on their face, and contained recitals that they were issued in conformity with law, and ascertain the nature of the refunded indebtedness.

The refunding statute did not, in terms, declare who should determine the fact of previous indebtedness. But Judge Lurton, in delivering the opinion of the court, said:

"Power was conferred upon the common council to issue new bonds to take up old ones falling due. The question as to whether there were any such bonds is referred to the council. The old bonds, on the facts found, were at least colorable obligations. The council determined to issue new bonds to take them up. It seems to me that, under these circumstances, it did not devolve upon the purchaser of the new bonds to look into the validity of the funded old bonds;" citing Coloma v. Eaves, 92 U. S. 484; Hackett v. Ottawa, 99 U. S. 86; and Chaffee Co. v. Potter, 142 U. S. 355, 12 Sup. Ct. 216.

In the present case the force of these suggestions is augmented by the fact that, by an express provision of the constitution of Michigan, boards of supervisors are empowered to adjust all claims against their respective counties, and from their decision there is no appeal. This jurisdiction is not exclusive, but, as against the county, any one having demands against it could obtain from the board a conclusive determination upon them. To require a purchaser of refunding bonds to scrutinize the successive issues in which the debt has been refunded, to its root, would seriously impair the market value of the bonds, and thus work injuriously to the interests of the municipality issuing them.

It is further objected that the act of 1885 did not authorize the issue of bonds negotiable in form, the contention being that that requires express authority, whereas this statute authorizes the issue of bonds, without more; and the cases of Merrill v. Monticello, 138 U. S. 673, 11 Sup. Ct. 441, and Brenham v. Bank, 144 U. S. 173, 12 Sup. Ct. 559, are cited, in which it was held that a statute authorizing a municipality to borrow money did not, by implication, carry with that authority the power to issue negotiable bonds. In the present case the power is given to issue bonds running for a long period of time, and bearing interest, and it appears on the face of the act that the bonds might be put upon the market and sold. We cannot doubt that negotiable bonds were intended. The same question was made in the Cadillac Case, above referred to; and it was held by this court, upon a statute of like kind, though not quite so clear in its implication, that the power to issue bonds must be taken to authorize bonds in the usual form of such well-known commercial obligations, and that the doctrine of Brenham v. Bank did not apply.

The act of 1885 is also attacked upon the ground that it is unconstitutional, in that it attempts to confer special powers upon the board of supervisors of a single county, and also because it authorizes them to borrow more than a thousand dollars in a year for constructing public buildings without a vote of the people. As to the first ground of objection, we find nothing in the constitution of the state which clearly, or by any necessary implication, limits the power of the legislature in the manner supposed.

Therefore, by a familiar rule on this subject, we cannot, upon that ground, hold the act invalid. The cases in Wisconsin (State v. Riordan, 24 Wis. 484, and State v. Supervisors, 25 Wis. 339) were decided upon the special provision of the constitution of that state, requiring a uniform system of local government, and have no application. And, in regard to the second, the bonds were issued to refund a debt, and not to raise money to erect public buildings. The purchaser, as we have already held, was not bound, in the face of the recitals borne by the bonds, to go back, and trace the indebtedness refunded.

We do not find it necessary to decide whether the judgments upon some of the first issue of bonds rendered by the circuit court of the United States created an estoppel against the county of Presque Isle, precluding it from denying the validity of the other bonds of that issue. Nor is it necessary to express any opinion upon the contention of counsel for defendant that the plaintiff, having taken the bonds and coupons in suit after their maturity, is, notwithstanding he derived them through one who was a bona fide holder for value and without notice, exposed to the assertion of any equities which the county had in reference to the bonds, for we conclude that it had none to assert.

There are a number of assignments of error relating to the admission and rejection of testimony; but, as they are not likely to arise upon a new trial, we think it best to pass them.

Another matter requiring attention is presented by the evidence recited in the bill of exceptions which was introduced by the parties upon the subject of the bona fides of the transfer of the bonds in suit as affecting the jurisdiction of the court. No issue of any sort was framed in the court below on the subject, but a question arose for the action of the court under the fifth section of the judiciary act of March 3, 1875, which requires the court, on its own motion, to dismiss the action, if it shall appear at any time that it has been collusively brought. The circuit court declined to make any express decision of the question, but it must be deemed, in legal effect, to have negatived the suggestion of collusion; otherwise, it could not properly have gone on, in the exercise of the jurisdiction, to the taking of the verdict and the rendition of the judgment. It is clear that such a question is an independent one, and cannot properly be confused with the issue on the merits; otherwise, it could not be determined from the verdict. whether it was founded on a question of jurisdiction, or of the cause of action. It was not a question for the jury, as the pleadings stood, but was one which the court was bound to decide before submitting the case upon its merit. On the face of the record, the court had jurisdiction, and the question may not arise upon another trial. It would seem that, in a case of fair doubt, the question was one for the trial court, though, undoubtedly, the court of appeals could and would deal with it, if the fault clearly appeared.

In the present case, upon reversing the judgment, we shall direct the circuit court to permit, in its discretion, an amendment

of the pleading of defendant by appending to the plea a plea in abatement, in accordance with the rules of practice of the circuit courts of the state, of the matter touching the jurisdiction, whereon a separate verdict can be taken; or, if it should be deemed best, to leave the question for its own disposition under the act of 1875.

The judgment must be reversed, and the case remanded to the court below, with directions to award a new trial, and for further proceedings in conformity with this opinion.

---

## On Rehearing.

### (February 5, 1894.)

SEVERENS, District Judge. In support of this application, four reasons are assigned by the petitioner:

First. It is suggested that the opinion of the court, as announced in regard to the original organization of Presque Isle county, proceeds upon the theory that the later organization in 1875 continued the previous one, whereas, it is urged, the people of the county, from the first, treated the act of 1871 as invalid, and the legislature, by the act of 1875, recognized the invalidity of the former act. The only action of the people of the county, which is referred to as being in repudiation of the original organization, consists of their applications to the board of supervisors of Alpena county in July, 1871, first for the annexation of territory to the township of Rogers, and second, for the formation of Presque Isle township, upon both of which applications the latter board took favorable action, to which no objection was made, but, on the contrary, it was acquiesced in. As to this, it is to be observed that we were of opinion that the act of 1871 provided for an organization thereafter to take place, the consequence of which was to leave the county of Presque Isle in its existing governmental relations with the county of Alpena until such organization should be effected. It was entirely consistent with this that, if the organization of the new county had not then been had, the people thereof should have made these applications to the Alpena county board, and that the board should have acted upon them, as it did. Indeed, it may be that these applications were made for the very purpose of qualifying the county to organize under the act.

In regard to the supposed disregard of the previous organization under the act of 1871 by the legislature in 1875, we do not think it necessary to repeat what was said in the former opinion. What was then said was aimed, not so much to demonstrate that the legislature affirmatively recognized the organization already made as a valid one, as to show that in our judgment there was no good reason for treating the later act as a repudiation of what had been done by the county, and further to express our opinion that rights which had in the mean time become vested could not, at all events, be defeated by this legislative action, however construed.

Second. It is said that the decision already made is in irreconci-

lable conflict with the decision of the supreme court in Norton v. Shelby Co., 118 U. S. 425, 6 Sup. Ct. 1121. Having already fully considered that case, and, as we think, shown the distinction between it and this, we do not think it necessary to go over the ground again. All the cases and reasons mentioned by the petitioner on this head were presented by the brief and arguments on the original hearing, and have been carefully considered by the court.

Third. The reason next assigned why a rehearing should be had is that the holding of the court "that because the bonds were issued to refund a debt, and not to raise money to erect public buildings, no vote of the people was necessary," is based in part upon the fact that the board of supervisors has sole power to pass upon claims against the county. This, it is said, is in direct conflict with the recent decision of the supreme court of Michigan in Supervisors v. Warren, 56 N. W. 1111. In passing, we observe that the petitioner's statement of our own opinion is rather broader than our language warrants. But if it be restricted to the proposition that, in the exercise of the authority conferred by the act of 1885 upon the board of supervisors to issue the new bonds, it was, by necessary implication, empowered to determine the validity of the refunded debt, we accept it as correct.

We have attentively examined the late decision of the supreme court of Michigan, above referred to, but are quite unable to find in it the alleged conflict with our own. In that case the court was asked to compel, by mandamus, the chairman of the board of supervisors to issue bonds to the amount of $30,000 to raise money for the support of the poor of the county, which bonds had been voted by the board without a popular vote. The object for which the money was to be raised on the bonds was one involved in, and covered by, the current expenses of the county. There was not, as here, any special act of the legislature authorizing such action of the board as had been taken, and the question of its authority depended upon the construction of the general statute which confers its powers. Judge McGrath, delivering the opinion of the court, after analyzing the subdivisions of the section of the statute which authorize the expenditure of county funds by the board for various purposes, and prescribe the means by which such funds may be raised,—whether by borrowing or by taxation,—points out that by subdivision 10, § 483, How. St., provision is expressly made for the raising of money for the current and contingent expenses of the county. And it was held that as this subdivision had no meaning or effect, unless it was construed as contemplating the raising of money for that particular class of expenses by tax only, it must be construed as having that effect, and to exclude the power to raise money for current expenses by borrowing which for other purposes was conferred by other provisions in the section, and the mandamus was therefore denied.

No question of the kind involved in this ground for rehearing was involved in, or decided in, that case. To the further suggestion that it would follow from the decision delivered by this court

that the board of supervisors might audit fraudulent claims, and issue bonds for them, and the county be remediless, it may be answered that responsibility of this kind must be devolved upon somebody, and it would seem that the interests of the county would be as likely to be safely guarded by their own representatives as by any other protection.

Lastly. It is claimed that the court made a mistake in remitting to the circuit court the question whether the suit was collusively brought, and it is alleged that our action is in conflict with the decisions of the supreme court of the United States, and the same cases in the reports of that court are cited in support of this contention, as were discussed in the brief and argument upon the former hearing. We have carefully considered them, and do not think it probable that any new light would be afforded by further discussion. It may be proper to add a few words to what we said upon this subject. We indicated our opinion to be that the duty of passing upon a question of this sort was devolved by the statute, in the first instance, upon the trial court, but that, nevertheless, the appellate court, in a clear case, would take notice of the fact, and would remand the case, with directions to dismiss it. But the court would deal with such a question as it does, on writ of error, with any other question of fact; that is to say, proof of the fact must be clear and unequivocal, in order to justify the court, upon a writ of error, in assuming the fact to be so. Such was the case in every instance which has been brought to our attention. It either appeared from the record itself, or was conclusively shown by the proof brought up in the bill of exceptions. In this case, as is implied from our opinion, we did not think the proof so clear as to justify such action in the appellate court.

The court below, when the question was before it upon the trial, failed to pass upon it expressly. As we were constrained to order a new trial upon the merits, and the question would be in its former position, where it could be dealt with in the court where questions of fact which are fairly controvertible are properly to be determined, we remitted the whole case to be tried and determined de novo. Upon reflection, we are satisfied that this was correct.

We think the petition for rehearing should be denied.