### DRAKE v. STEWART.

(Circuit Court of Appeals, Eighth Circuit. August 24, 1896.)

No. 734.

1. EVIDENCE—ACTS OF CO-CONSPIRATORS.
   Upon the production of evidence from which the jury may reasonably infer the joint assent of the minds of two or more persons to the prosecution of an unlawful enterprise, any act or declaration of one of the parties in reference to the common object, which forms a part of the res gestæ, may be given in evidence against any one of the others who has consented to the enterprise.

2. CONSPIRACY—EVIDENCE.
   The joint assent of the minds of the parties to a conspiracy may be found by the jury, like any other ultimate fact, as an inference from other facts proved.

3. CONSPIRACY—EVIDENCE.
   Defendant, the county marshal, was told by one B. that some persons would be arrested that night, and that he must be particular as to what bail bond was taken, and to this he replied that that would be "all right." That night B. obtained a warrant from a justice for plaintiff's arrest for common assault, and she was arrested and taken to the county jail at 9 o'clock p. m., and there put in charge of defendant's deputies. Plaintiff demanded to be brought before the justice who issued the warrant, to give bail, but B. falsely stated that he was out of town. Another justice then prepared a bail bond, but the deputy marshal refused to accept it, stating that he was instructed not to receive any bond, and plaintiff was detained in jail until the next morning. Defendant testified that he knew nothing of the parties to be arrested, or the charge against them. Held, that there was evidence for the jury that defendant conspired with B. to detain plaintiff in jail overnight by refusing to accept bail.

In Error to the Circuit Court of the United States for the Western District of Missouri.

John W. Beebe, for plaintiff in error.

John H. Lucas, for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. Maud Lord Drake, the plaintiff in error, sued Henry P. Stewart, the marshal of Jackson county, Mo., the defendant in error, for conspiring with one Bloss to detain her in jail overnight, without bail, on a charge of a common assault, for refusing to take or accept offered bail for her appearance to answer for that charge, and for detaining her in jail without bail. At the close of

the evidence the court instructed the jury to return a verdict for the defendant, and this writ challenges the judgment upon that verdict.

The amended petition upon which the case was tried contained three counts. In the first count the plaintiff alleged that on March 11, 1892, the defendant, Stewart, was the marshal of Jackson county, Missouri, that he had the custody and rule of the common jail of that county, and that John Emmons and Daniel O'Mara were his deputies, agents, and representatives in charge thereof. She alleged that on that day the defendant, Stewart, and one Bloss entered into a conspiracy to wrongfully detain her in the common jail; to cause her to be arrested for a common assault by Bloss; to cause her to be taken immediately to the jail, and delivered to Stewart and his deputies, without an opportunity to give bail; and to cause her to be detained in jail by Stewart and his deputies, without allowing her to give bail for her appearance. She alleged that, in pursuance of this conspiracy, Bloss caused a warrant to be issued by a justice of the peace in the evening of March 11th, arrested her, and took her directly to the jail, and delivered her to Emmons and O'Mara, the deputies of Stewart, who detained her there until the next morning. She alleged that, before and after she arrived at the jail, she offered to give proper bail for her appearance to answer the charge in the warrant the next morning, but that Bloss and the deputy marshals all refused to accept any bail or bond whatever. The second and third counts of the petition allege the unlawful detention, but omit the charge of conspiracy. The defendant, in his answer to this petition, admits that he was the marshal of Jackson county; that a warrant was issued by a justice of the peace for the arrest of the plaintiff; that she was arrested by one of the constables of Kaw township, by virtue of the warrant; and that the constable placed her in the common jail of the county; and he denies all the other allegations of the petition.

There was evidence tending to establish these facts: William Bloss and one Mathias were fellow reporters on a newspaper, and Bloss was a deputy constable. About 5 o'clock in the afternoon of March 11, 1892, they engaged two more deputy constables to go with them in the evening to arrest Mrs. Drake and a Dr. Kimmel, at whose residence she was visiting. In another action in which this transaction was involved, the defendant, Stewart, had testified that at about 7 o'clock that evening Bloss came to his house, and told him that there were some parties who would be arrested that night, and that he wanted them to be particular what kind of a bond they took,—to be careful of a straw bond,—and that he replied that that would be all right. He also testified that he did not know who the parties to be arrested were, and that he never found out anything about it until the next morning. About 8 that evening, Mathias, Bloss, and two other constables went to a hall in Kansas city, where H. D. Barto, a justice of the peace, was attending a meeting. They called him out, Mathias made a complaint against Mrs. Drake for a common assault, and the justice issued a warrant addressed to the marshal, or any constable of the county, or the chief of police of Kansas City, which commanded them to take Mrs. Drake, and have her forthwith before the justice to answer the complaint. Justice Barto informed

Bloss and his associates that he should be at the hall, where he then was, until 1 or 2 o'clock the next morning.    Bloss and his associates then proceeded to the residence of Dr. Kimmel, where they arrested Mrs. Drake, took her directly to the county jail, and delivered her to Emmons and O'Mara, the deputies of the defendant, Stewart, at about 9 o'clock that evening, who kept her in the common jail all night.    In the morning another deputy came in, and informed her that she was free and could go.    When the arrest was made, Mrs. Drake demanded to be taken before Justice Barto to give bail; but Bloss falsely represented to her that he was not in the city, but lived six miles in the country, and had gone to a political meeting.    Her attorney or Dr. Kimmel telephoned repeatedly to the residence of Stewart, in order to arrange with him for her to give bail, but the answer came back that he was not at home.    After Mrs. Drake was taken to the jail, her attorney informed the deputy marshals that he would hunt up a justice of the peace, and give bail for the appearance of Mrs. Drake, and asked them not to put her in a cell until he returned.    He went to Justice Worthen, whose office and residence were nearer to the jail than those of any other justice, and persuaded him to go to the jail, where a bond was executed, and approved by him, for the appearance of Mrs. Drake before Justice Barto the next morning to answer to the charge of assault.    It was 12 o'clock midnight when this bond was completed and approved.    It was then tendered to the deputy marshal, Emmons, who refused to accept it, not on account of want of authority of Justice Worthen to take and approve it, but because, as he said, he was instructed not to receive any bond. The justice remonstrated with him, told him that he had accepted bonds in felony cases approved by him twice within a week, and that this woman had a right to go.    His reply was, "She can't go."

The court rejected the following offers of testimony:    The plaintiff offered to prove by one of the constables that when Bloss returned from his visit to the residence of Stewart on that evening, and when he was proceeding with him to obtain a warrant for the arrest, he said "that he (Bloss) had got the thing plugged, and that he had arranged it so Stewart should be away from the house, where he could not be accessible, and they couldn't get bail of Stewart or his deputies."    She offered to prove by Justice Barto that, after an attempt had been made to indict Bloss for malfeasance in office, Stewart said to Barto, "If it hadn't been for him being able to fix the grand jury, they would have been in a hell of a fix," and that, during the trial of Bloss in the criminal court, Stewart said to Barto, "he hoped I wouldn't be any harder on Bloss than I had to be."    The plaintiff assigns as error the peremptory instructions to the jury to return a verdict for the defendant, the refusal to receive in evidence the rejected testimony just recited, and many other rulings of the court.

A conspiracy is the combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means.    In order to establish a conspiracy, evidence must be produced from which a jury may reasonably infer the joint assent of the minds of two or more persons to the prosecution of the unlawful enter-

prise. Until such evidence is produced, the acts and admissions of one of the alleged conspirators are not admissible as evidence against any of the others, unless the court, in its discretion, permits their introduction out of their order. But, when such evidence has been produced, any act or declaration of one of the parties in reference to the common object which forms a part of the res gestæ may be given in evidence against any one of the others who has consented to the enterprise. Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542; Spies v. People, 122 Ill. 1, 102, 238, 12 N. E. 865, and 17 N. E. 898; Archer v. State, 106 Ind. 426, 432, 7 N. E. 225; U. S. v. Cassidy, 67 Fed. 698, 702. The joint assent of the minds of the parties to a conspiracy may be found by the jury, like any other ultimate fact, as an inference from other facts proved. Glaspie v. Keator, 12 U. S. App. 281, 286, 5 C. C. A. 474, 476, and 56 Fed. 203, 205; Spies v. People, 122 Ill. 1, 102, 238, 12 N. E. 865, and 17 N. E. 898; Archer v. State, 106 Ind. 426, 432, 7 N. E. 225. It is only when the undisputed facts are such that reasonable men can fairly draw but one conclusion from them that the court may properly withdraw a question of fact from the determination of the jury. Railway Co. v. Jarvi, 10 U. S. App. 439, 451, 3 C. C. A. 433, 438, and 53 Fed. 65, 70.

In view of these principles of law and rules of decision, was the evidence in this case such that all reasonable men must, in the impartial exercise of their sound judgment, arrive at the conclusion that the defendant, Stewart, never assented to the nefarious scheme of Bloss? This is the first and most important question in this case. The evidence conclusively proved that Bloss intended to keep the plaintiff in prison in the county jail, without bail, through the night, and that he successfully accomplished that purpose. This scheme and its fulfillment were unlawful and malicious. Under the circumstances of this case, where a woman was arrested in a populous city, supplied with magistrates easily accessible, at 9 o'clock in the evening, for the trivial offense of a common assault, and offered to give ample bail, the statutes of the state of Missouri, and the warrant under which the arrest was made, required the marshal, his deputies, and the constables to take the prisoner forthwith before the justice who issued it, or before some other proper officer, so that she could give bail for her appearance, and avoid a detention in the common jail through the night. Rev. St. Mo. 1889, §§ 4026, 6109. It is clear that Bloss thought it necessary to the successful execution of his plan that the defendant, Stewart, should be informed beforehand that some parties were to be arrested that evening, and that he wanted him and his deputies not to take a straw bond. He accordingly went to Stewart's residence, and told him this, and the defendant said, "All right." The scheme worked successfully. The deputies of Stewart took no straw bond. They took no bond at all. The chief deputy said, a few hours after this conversation between Bloss and Stewart, when a bond for the plaintiff's appearance in the morning, approved by the nearest justice of the peace, was tendered to him, that they were instructed not to take any bond whatever for this prisoner, and that she could not be released. This deputy was acting for his principal, the defendant. He was acting within the scope of his authority in the

discharge of his customary duties. The legal presumption, therefore, is that he was acting by command of his superior, and that he and his fellow deputy had received these instructions not to accept any bond whatever for the appearance of the plaintiff from his principal, the defendant, Stewart. Grinnell v. Phillips, 1 Mass. 529, 534. The fact that Stewart testified that he did not know who the parties to be arrested were, or upon what charge they were to be arrested, and that he found out nothing about it until the next morning, has not escaped our attention. The acts and the effects of the acts of a defendant often point to the truth as unerringly as his testimony, and this testimony of the defendant must be considered by the triers of the fact in the light of the surrounding circumstances, and the acts of his deputies. In view of the legal presumption that these deputies received their instructions from their principal, and were acting by his command; in view of the fact that Bloss thought it necessary to the success of his plan that he should have a conversation with Stewart, in which he notified him that parties were to be arrested that evening, and that no straw bond should be taken, before he entered upon the execution of his enterprise; and in view of the significant fact that this conversation seems to have had the exact effect that the joint assent of the minds of Bloss and Stewart to the execution of the former's plan would have had,—we are unwilling to say that reasonable men might not fairly draw the inference that Stewart consented to this enterprise, and gave the instructions to his deputies to take no bonds, in order to assist in its prosecution. This question should have been submitted to the jury.

The conclusion which has been reached upon the question already considered, will necessarily result in a reversal of the ruling of the court below rejecting the testimony of the admissions of Bloss after he had left Stewart's residence, and entered upon the prosecution of his enterprise. In the view which the court below took of the evidence, its ruling was right; but, in view of the conclusion that has been forced upon us, the acts and statements of Bloss, while he was carrying out the plan after his conversation with Stewart at his residence, became competent evidence for the consideration of the jury, under the rule that the acts of each co-conspirator in pursuing the common object become the acts of all. The testimony of Justice Barto to the statement of the defendant relative to the condition in which they would have found themselves if they had not fixed the grand jury, and to his request that Barto would spare Bloss, is admissible, as in the nature of admissions against interest. The conclusions at which we have arrived compel us to grant a new trial of this case, in any event, because in our opinion there was evidence for the consideration of the jury under the first count of the petition. This result could not be modified by any opinion we might form upon the questions of law presented by the second and third counts, and their consideration and decision will therefore be deferred. The judgment below must be reversed, with costs, and the case remanded to the court below, with directions to grant a new trial, and it is so ordered.