SPEER v. BOARD OF COUNTY COM'RS OF KEARNEY COUNTY, KAN.

(Circuit Court of Appeals, Eighth Circuit. June 20, 1898.)

No. 1,003.

1. COUNTIES—ORGANIZATION—POWERS OF TEMPORARY BOARD OF COMMISSION-ERS.

Under Gen. St. Kan. 1889, par. 1577 et seq., providing for the organiza-tion of new counties, and authorizing the governor to appoint temporary officers, on whose qualification "the county shall be deemed to be duly organized," a temporary board of commissioners so appointed has power to audit claims for legitimate county expenses, and to issue warrants therefor.

2. JUDGMENT—CONFORMITY TO ISSUES.

A general judgment for defendant, which does not clearly show that it rests solely on a plea that the action was prematurely brought, cannot be sustained by the sufficiency of that plea. and of the proof under it, where the plea in abatement is joined with pleas in bar in the same action.

3. APPEAL AND ERROR—REVIEW—QUESTION NOT PRESENTED TO TRIAL COURT.

In an action on county warrants, a plea in abatement on the ground that the warrants were not presented to the county treasurer for payment before suit brought, which was not presented to the trial court for decision, will not be considered by an appellate court, where it does not appear that the failure to present the warrants was prejudicial to the county.

4. COUNTY WARRANTS—VALIDITY—EVIDENCE OF OVERISSUE.

A contention that county warrants in suit are void because issued after the limit in amount authorized by statute had been passed is not sup-ported by proof that the warrants in suit were issued in the order of the numbers they bear, and that warrants bearing lower numbers than any in suit were issued to an aggregate amount, which still left a margin within which others might legally be issued.

5. TRIAL—DIRECTION OF VERDICT—PROVINCE OF COURT.

It is only when the evidence upon an issue is free from conflict, or so clear and convincing that all reasonable men who exercise an honest judgment upon it are compelled to reach the same conclusion, that the court is justified in withdrawing the question from the jury.

6. COUNTIES—TEMPORARY COMMISSIONERS—EMPLOYMENT OF COUNSEL.

A temporary board of commissioners, appointed under the laws of Kansas on the organization of a new county, has power to employ attorneys to protect the interests of the county, and advise its officers, until the election of a county attorney.

7. COUNTY WARRANTS—PRESUMPTION OF VALIDITY—EVIDENCE TO IMPEACH.

Warrants issued by a board of county commissioners having authority to allow claims against the county, in payment of claims regularly allowed, are prima facie evidence of the just indebtedness of the county; and where a warrant in suit purported to be issued in payment for the services of an attorney previously employed by the board, and was in itself reasonable in amount, the fact that other warrants, aggregating a large amount, were also issued on the same day to the same person, does not authorize the court to withdraw from the jury the question of the validity of the warrant in question, and direct a verdict on the assumption of its invalidity.

8. SAME—SUPPORT OF POOR—POWER OF COMMISSIONERS.

Under the statutes of Kansas requiring counties to support the poor, and the boards of commissioners to levy taxes for the purpose (Gen. St. 1889, pars. 4030, 4061), neither the fact that no levy for the purpose had been made in a county newly organized, nor that the immediate care of poor persons devolved on city or township officers, will invalidate war-

rants issued by the board in payment of indebtedness incurred in supporting the poor.

**9. SAME—DEFENSES—IRREGULARITY IN ISSUANCE.**

Gen. St. Kan. 1889, pars. 1659, 1661, make it unlawful for a county board to allow claims (with certain exceptions) except at a regular meeting, and that violation of the requirement by commissioners shall be a misdemeanor, punishable by fine. *Held*, that where warrants, regular on their face, were issued in payment of claims, the county could not defend against them in the hands of a purchaser on the ground merely that they were irregularly issued, in that the claims were allowed at a special meeting of the board.

**10. MUNICIPAL CORPORATIONS — EVIDENCES OF DEBT — ESTOPPEL TO QUESTION REGULARITY.**

A municipal corporation which, by the regularity of the execution of evidences of its debts, which is apparent upon their face, induces persons to buy them, is thereby estopped from denying their validity or effect on the ground that, in their execution or in the preliminary proceedings which warranted their execution, its officers failed to comply with some law or rule of action relative to the mere time or manner of their procedure, with which they might have complied, but which they negligently disregarded.

**11. FEDERAL COURTS — FOLLOWING STATE DECISIONS—CONSTRUCTION OF STATUTES.**

Decisions of state courts as to their statutes, which affect the validity of contracts between citizens of different states which were made, or under which rights were acquired, before there was a judicial construction of the statute which seemed to authorize the contracts, are not obligatory upon the courts of the United States.

**12. SAME—EFFECT OF INVALIDITY OF STATUTE.**

The question as to what effect the invalidity of a legislative act creating a township has upon the validity of warrants issued for indebtedness incurred by such township, in the hands of purchasers who are citizens of another state, is one upon which a federal court is not concluded by a state decision, rendered after the warrants were purchased.

**13. MUNICIPAL CORPORATIONS—ESTOPPEL TO DENY CORPORATE EXISTENCE.**

Where, by a legislative act, an unorganized county was attached to another county, and by existing statutes it thereby became a township of the latter county, and under such statutes was organized and assumed to act as such, without question by the state or its inhabitants until it was organized as a county, warrants issued after the county was organized, based on obligations incurred by the township, cannot be avoided in the hands of third persons to whom they were sold, on the ground that the act by which the unorganized county was attached to the older county was unconstitutional.

**14. SAME—DE FACTO CORPORATIONS.**

In such case the township was not organized under color of the unconstitutional act, but by virtue of the general statutes, and its acts were those of a de facto township.

**15. SAME—ACTING UNDER UNCONSTITUTIONAL STATUTE.**

The acts of a de facto corporation under an unconstitutional law, before its invalidity is challenged in or declared by the judicial department of the government, cannot be avoided as against the interests of the public or of third parties who have acted or invested in good faith in reliance upon their validity by any ex post facto declaration or decision that the law under which it acted was void.

In Error to the Circuit Court of the United States for the District of Kansas.

Frederic D. Fuller and F. P. Lindsay (George H. Whitcomb, on brief), for plaintiff in error.

Samuel R. Peters (M. G. Kelso and John C. Nicholson, on brief), for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and SHIRAS, District Judge.

SANBORN, Circuit Judge. The questions presented by this case relate to the validity of certain county warrants issued by the board of county commissioners of Kearney county, in the state of Kansas, in the year 1888. These questions are raised by exceptions to instructions given to the jury to the effect that the plaintiff in error, H. C. Speer, was not entitled to recover upon the warrants on the evidence in the record at the close of the trial. Speer was a bona fide purchaser of the warrants in the open market. Counsel for the county present many propositions in support of the instructions of the court. Some of them challenge the validity of all the warrants. Others attack specific warrants only. Some were disregarded or overruled, while others were sustained by the court below. We can state them most clearly, and dispose of them most satisfactorily and speedily, by considering them seriatim.

The first proposition of the counsel for the county is common to all the warrants, and it was overruled by the court below. It is that the board of county commissioners had no power to issue these warrants, because it was a temporary board, appointed by the governor of Kansas under the act of the legislature of that state relating to the organization of new counties. Gen. St. Kan. 1889, pars. 1577–1594. That question, however, has been considered and decided against the county by this court in Board v. McMaster, 32 U. S. App. 367, 370, 15 C. C. A. 353, 355, and 68 Fed. 177, 179; and, after a careful review of the arguments on the subject, we are constrained to adhere to the views there expressed.

The statutes of Kansas provide that:

"The board of county commissioners of each county shall have power, at any meeting: * * * Second, to examine and settle all accounts of the receipts and expenses of the county, and to examine and settle and allow all accounts chargeable against the county; and when so settled, they may issue county orders therefor, as provided by law." Gen. St. Kan. 1889, par. 1630.

The act relating to the organization of new counties empowers the governor, upon a proper memorial and upon adequate returns showing the population and the value of the property in the county, to appoint three persons, citizens of said unorganized county, to act as commissioners, provides that, "from and after the qualification of the county officers appointed under this act, the said county shall be deemed to be duly organized," and authorizes these commissioners to divide the county into townships, to prepare a polling list of the legal voters in each township, to give notice of an election for the choice of township and county officers and of the permanent county seat of the county, and to canvass the votes at the election. Gen. St. 1889, pars. 1577, 1582, 1584, 1587.

It is manifest from these provisions that duties were imposed upon, and powers were vested in, these commissioners, whose discharge and exercise required them to incur indebtedness on behalf of

the new county; and as, from the nature of the case, such a county could not have funds on hand with which to discharge such a debt, the inference is natural and logical that it was the purpose of the legislature to empower the commissioners, not only to incur debts, but to allow such claims and to issue such county warrants as were requisite to enable them to discharge the duties imposed upon them. When, in addition to this consideration, the express provision of the act that, upon the qualification of the temporary county officers, the county shall be deemed duly organized, is noticed, this inference becomes irresistible, and there is no logical escape from the conclusion that the temporary board of county commissioners was invested with the same powers as those given to the permanent board to incur debts, to allow claims, and to issue county warrants for legitimate county expenses.

Another proposition urged to support the instruction of the court to return a verdict for the county is that the action upon all these warrants was premature, because they were not presented to any county treasurer of the county for payment before the action was commenced. The fact is that they were presented during the year 1888, after the appointment and qualification of the temporary county commissioners, and before the election of any permanent officers of the county, to one W. P. Loucks, who was acting as county treasurer, and who indorsed upon them the fact and the dates of presentation, together with the words: "Not paid for want of funds. W. P. Loucks, County Treasurer." Conceding, but not deciding, that an action upon a county warrant, before it is presented to the county treasurer for payment, is prematurely brought (Dill. Mun. Corp. § 501; Daniel, Neg. Inst. §§ 430, 908; City of Central v. Wilcoxen, 3 Colo. 566; Varner v. Inhabitants of Nobleborough, 2 Greenl. 121; Benson v. Inhabitants of Carmel, 8 Greenl. 112; Pease v. Inhabitants of Cornish, 19 Me. 191; Dalrymple v. Whitingham, 26 Vt. 346), and that Loucks was not the county treasurer of this county when these warrants were presented to him (Atchison, T. & S. F. R. Co. v. Board of Com'rs of Kearney Co. [Kan. Sup.] 48 Pac. 583, 585), there are two reasons why the judgment against the plaintiff cannot be sustained upon this ground. The first is that the only instruction which this defense would warrant was an instruction that the jury should find that the action was prematurely brought, because payment had not been demanded of the county treasurer, and the only judgment which this defense would justify was a judgment for the defendant, without prejudice to a subsequent action on the same warrants, while the instruction given was that the plaintiff could not recover, and the judgment rendered was a general judgment for the defendant on the merits. The defendant had joined several pleas in bar with this plea in abatement in its answer; and the general instruction and judgment for the defendant, without specifying upon which defense it was based, renders all the issues presented in the case res adjudicata, and constitutes a bar to all future actions upon these warrants. A general judgment for the defendant, which does not clearly show that it rests solely upon a plea that the action was prematurely brought, cannot be sustained by the sufficiency of that plea and of the proof to sustain it, where the plea in abatement is joined with pleas in bar in the

same action. House v. Mullen, 22 Wall. 42, 46; Four Hundred and Twenty Min. Co. v. Bullion Min. Co., 9 Fed. Cas. 592, 599 (No. 4,989), 3 Sawy. 634; Sheldon v. Edwards, 35 N. Y. 279, 287, 288; U. S. v. Pine River Logging & Improvement Co., 49 U. S. App. 24, 35, 24 C. C. A. 101, 107, and 78 Fed. 319, 325. The second reason why the judgment cannot be sustained on this ground is that this objection was not presented to the court below for decision, and was not considered either by the court or by counsel on either side at the trial. It is plain that the objection has little, if any, merit, and that it could easily have been removed if it had been seasonably called to the attention of the plaintiff. He could have dismissed this action, made his demand, and brought another. Perhaps he could have proved that a demand had been made of the county treasurer after the permanent officers of the county had been elected. No statute of the state has been called to our attention which makes a presentation or a demand of payment of these warrants an indispensable prerequisite to the maintenance of an action upon them. If a demand of their payment was necessary, that necessity grew out of the fact that, under the general rules of law, the drawer of a draft, check, or order is not liable to suit upon it until after its presentation to the drawee for payment; and if, at any time before this action was commenced, the holder of these warrants formally or informally asked the county treasurer to pay them, and he refused, such a request undoubtedly removed the objection. Pease v. Inhabitants of Cornish, 19 Me. 191, 193. In Kelley v. Mayor, etc., 4 Hill, 263, 266, it was held that if it affirmatively appeared that the municipality had not suffered, and could not suffer, any loss from want of presentment or of notice of nonpayment of such a warrant, neither was necessary. It is hardly possible that the county of Kearney can have suffered any loss from the failure to present and demand the payment of these warrants. It is very probable that it could have found and paid them, if it had been anxious to do so. A defendant cannot be permitted to present for the first time in an appellate court an objection to the plaintiff's recovery so easily removed, which he passed in silence at the trial.

It is contended that the warrants are void, and that the plaintiff was not entitled to recover upon them, because they were issued in violation of the limitation prescribed by paragraphs 1886 and 1887, Gen. St. Kan. 1889. Paragraph 1886 provides that the board of county commissioners shall not levy upon the taxable property of the county for current expenses of the county for any one year in excess of 1 per cent. upon a valuation of $5,000,000 and under; and paragraph 1887 forbids a board of county commissioners or county clerk to issue county warrants or orders in any one year to a greater amount than the amount of the county tax levied in the same year to defray county charges and expenses, less the amount levied for delinquencies. The proclamation of the governor appointing the temporary county commissioners, which was made on March 27, 1887, declared the value of the taxable property in the county to be $1,079,081, exclusive of railroad property, and the value of the taxable property of railroads credited to this county was $266,959.20. This made

the entire taxable property of the county at that time $1,346,040.20. The amount of warrants issuable under the limitation in paragraph 1887 was, upon this basis, $13,460.40. On August 1, 1888, the state board of equalization reduced the valuation of the taxable property of this county, exclusive of railroad property, to $934,160.20, but left the valuation of the railroad property $266,959.20. This made the value of the taxable property of the county $1,201,119.40, and the limit of the amount of issuable warrants $12,011.19. All the warrants in suit were issued in the year 1888. They all bear numbers higher than 34, and there is evidence that they were issued in the order of their numbers. There is, however, no evidence in this record which shows to what amount warrants had been issued when any of those here in question were emitted by the county, except the fact that warrants to the amount of $10,625.75 had been issued before warrant number 34 was issued. This fact alone was clearly insufficient to prove that any of the plaintiff's warrants were issued after the limitation of the statute had been reached. On the most favorable basis for the county, the board of county commissioners was authorized to issue warrants to the amount of $12,011.19, while the utmost amount proved to have been issued before these in suit was $10,625.75; and these warrants come supported by the presumption that the officials who issued them did not violate, but faithfully obeyed, the law.

Another claim of the county is that these warrants were all fraudulently issued, without any consideration. There is evidence in this record which tends strongly to support this position. The temporary board of county commissioners of this county issued warrants to the amount of $137,543.02; it issued warrants to the amount of $21,181.60 for attorneys' fees; it issued warrants to the amount of $4,275.27 to one of its members; and it did all this in less than eight months. If the court below had been trying the facts in this case, and had reached the conclusion that these warrants were fraudulently issued, perhaps we should not have disturbed the result. The evidence may be sufficient to warrant that conclusion. But that is not the question before this court, nor was it the question before the court below. This was not a trial by the judge, but by the jury; and it was the province of the jury to determine every question of fact concerning which the evidence was conflicting,—every question of fact the answer to which was uncertain. It is only when the evidence is free from conflict, or so clear and convincing that all reasonable men who exercise an honest judgment upon it are compelled to reach the same conclusion, that the court is justified in withdrawing the question from the jury. Railway Co. v. Jarvi, 10 U. S. App. 439, 451, 3 C. C. A. 433, 438, and 53 Fed. 65, 70; Drake v. Stewart, 40 U. S. App. 173, 178, 22 C. C. A. 104, 107, and 76 Fed. 140, 143; Railway Co. v. Hall, 87 Fed. 170. Now, while the testimony in this record may be sufficient to warrant a verdict that some of the warrants issued by this temporary board must have been fraudulently issued without adequate consideration, it is not so free from conflict, nor is it so clear and convincing, that it can truthfully be said that reasonable men might not honestly draw the conclusion from it that some, if not all, of the warrants in suit, were

honestly issued for a sufficient consideration.    Take, for example, the first warrant regarding which the court instructed the jury to find for the defendant.    It reads:

"No. 93.                    County Clerk's Office.                    $245.00.
"Lakin, Kansas, July 3, 1888.

"Treasurer Kearney County, Kansas:  Pay to L. J. Webb or bearer the sum of two hundred and forty-five and x/100 dollars, for services for counsel for Kearney county, out of any money in the treasury not otherwise appropriated.   By order of the board of county commissioners.
"J. H. Waterman, Clerk.                    W. J. Price, Chairman."
Indorsed: "Presented for payment, July 3rd, A. D. 1888, but not paid for want of funds.                    W. P. Loucks, County Treasurer.
"Registered No. 86.
"[Seal County Clerk, Kearney County, Kansas.]"

This order was introduced in evidence.    It was supported by a resolution of the board adopted April 3, 1888, that "F. P. Lindsay, of Lakin, Kansas, and Webb, Campbell & Spencer, of Topeka, Kansas, be, and they are hereby, employed to represent this board, and to protect the interests of Kearney county until a county attorney is elected," by the fact that the claim of Webb for these services was allowed by the board, and by the fact, which was drawn from him on his cross-examination, that the temporary county clerk had testified in another action that L. J. Webb rendered services for Kearney county as an attorney at law between April 3, 1888, and July 2, 1888, and that this warrant was issued to him on account of his retainer.    It is true that this evidence was met by the testimony of the same witness that Webb had rendered no services to the county prior to July 2, 1888; that five warrants were issued to him on July 3, 1888; and that the aggregate amount of the warrants issued to him was $12,163.94, while the sum total of all the warrants which the board issued was $137,543.02.    We do not doubt that the employment by this board of attorneys to render legal services which were worth $12,163.94, if such services were ever rendered, was an indefensible and wanton abuse of its power.    But it is no less certain that the board had authority to employ attorneys to give legal advice, and to render such services as the county and its officers required to enable them to enforce the rights and protect the interests of the former, and to enable the latter to discharge the duties imposed upon them in a just and legal manner.    There was no county attorney, and the only way the county officers could obtain needed legal advice and services was through the employment of attorneys. Board of Com'rs v. McMaster, 32 U. S. App. 367, 370, 15 C. C. A. 353, 355, and 68 Fed. 177, 180; Commissioners v. Brewer, 9 Kan. 307, 317; Huffman v. Commissioners, 23 Kan. 197, 198.    Whether or not this particular warrant for $245 was honestly issued, in payment of the fair value of such services, or was fraudulently issued, without an adequate consideration, was a question fairly presented by this evidence; but we are unable to say that the evidence was so conclusive against its validity that the court could rightfully withdraw this issue from the jury.    The warrant itself was prima facie proof of the validity of the claim it evidenced.    The board was empowered to hear and determine claims against the county, and to issue warrants therefor.    These warrants evidence the decision and judgment of the board

that the county is justly indebted to the holders thereof in the amounts stated therein. They are not conclusive evidence of the indebtedness they admit. The county may defeat them by proof that they were without consideration, that they were fraudulently issued to the dam-.age of the county, or that the incurrence of the debts and the allow-ance of the claims they evidence were beyond the jurisdiction of the board. But the presumption is that the action of the board was right and just, and the burden of establishing these defenses is upon the county. Until one of them is established, the warrants are prima facie evidence of just debts of the county, upon which the holder is entitled to judgment in any court of competent jurisdiction. Wall v. County of Monroe, 103 U. S. 74, 77; Thompson v. Searcy Co., 12 U. S. App. 618, 627, 6 C. C. A. 674, 679, and 57 Fed. 1030, 1036; Board of Com'rs v. Sherwood, 27 U. S. App. 458, 464, 11 C. C. A. 507, 511, and 64 Fed. 103, 107; Commissioners v. Keller, 6 Kan. 511, 523. The answer to the question whether one of these defenses had been established at the close of the evidence in this case, after the resolution of employment, the evidence that this warrant was issued on account of the retainer of Webb, and the prima facie proof of indebtedness which the warrant made, was too doubtful to justify the court below in substituting its finding for that of the jury. A careful considera-tion of all the evidence relative to each of the other warrants in issue has led us to the same conclusion. The question of the fraudulent issue and the want of consideration of each of these warrants was a question for the jury, and not for the court.

Some of these warrants were issued for supplies for the poor, and it is insisted that it was beyond the power of the board to incur or allow any obligation of this kind. But the statutes of Kansas provide that every county shall relieve and support all poor and indigent persons lawfully settled therein whenever they stand in need (Gen. St. 1889, par. 4030), and that the board of county commissioners may levy taxes for their support (Id. pars. 4030, 4061; Railroad Co. v. Albright, 33 Kan. 211, 213, 6 Pac. 276; Fields v. Russell, 38 Kan. 720, 722, 17 Pac. 476). The suggestions that no levy of taxes for the support of the poor had been made when these warrants were issued, and that the mayor and council of every incorporated city and the township trustee of each civil township are made overseers of the poor in their respec-tive townships (Gen. St. 1889, pars. 4027, 4028), and are given the over-sight and care of all poor persons so long as they remain a county charge (Id. pars. 4033, 4036), are without merit. It was just because no levy had been made and collected, and because none could be made and collected, when the debts evidenced by these warrants were in-curred, that the power was vested in the board to issue warrants in anticipation of the revenue, in order to provide for the current ex-penses of the county. It is not material here whether or not there were any township trustees or city officers who were overseers of the poor in this county when these debts were contracted. If there were none, it was the duty, and therefore it was within the power, of this board of commissioners, to relieve and support all poor and indigent persons within their county; and, if there were such, this board was required by statute to pay any lawful obligations which they incurred

for the support of the suffering poor. Paragraphs 4048 and 4046. In either event the board had plenary power to incur obligations and to issue warrants for the support of the poor of its county, and it was the very body upon which the statutes had imposed that duty.

Another position of counsel for the county is that there could be no recovery upon some of these warrants, because the claims upon which they rested were not allowed at regular, but were allowed at adjourned or special, sessions of the board. This contention rests upon the following provisions of the General Statutes of Kansas of 1889:

"(1659) Unlawful to Allow Claims. § 39a. It shall be unlawful for any board of county commissioners to allow any claim or account against the county at any special or adjourned meeting of the board, except for election expenses and jury fees; and all other claims or accounts against the county shall be allowed only at the regular meetings of the board in January, April, July and October of each year."

"(1661) Penalty. § 39c. Any county commissioner violating any of the provisions of this act, shall be deemed guilty of a misdemeanor, and, on conviction thereof, be fined in a sum not exceeding five hundred dollars, or by imprisonment in the county jail for the term not exceeding one year, or by both such fine and imprisonment."

It is conceded that a purchaser of these warrants does not secure the immunity from defenses accorded to the purchaser of commercial paper under the law merchant. He takes them subject to the defenses that the allowance of the debts and the issue of the warrants were not within the scope of the authority of the board, that they were without consideration, and that they were fraudulently created. In short, he takes them subject to all defenses which challenge the merits of the claims. Nevertheless, the warrants themselves are prima facie evidence that the debts are just, and that such defenses do not exist. It was within the power of this board, and it was its duty, to determine the validity of the claims on which these warrants rested, to allow or disallow them, and, if allowed, to issue warrants for their payment. The statute prescribed the time and the manner in which the board should exercise this power and discharge this duty. It did exercise the power and issue the warrants, which were regular on their face, and were apparently prima facie proof of the validity of the debts which they admitted. The statute does not require that these warrants shall be issued or dated on the same day upon which the claims which they evidence are allowed, and they contain no notice or warning, by date or otherwise, that the board which issued them, and which was authorized to issue them, exercised its power at any other time or in any other manner than those prescribed by the law. The plaintiff, a citizen of the state of Illinois, is a holder of the warrants. The presumption is that he found them in the open market, and bought and paid for them in reliance upon the legal presumption, which certainly accompanied them, that the county board had exercised its power at a lawful time and in a legal manner. Can the county defeat the warrants now, or deprive them of their force as prima facie evidence of its debts, in the hands of this bona fide purchaser, by proof of the bare fact that its board of commissioners carelessly or willfully exercised this power on the wrong day, without any evidence of the fact that the claims which they represent were in

fact unfounded or unjust? The right answer to this question does not appear to be doubtful. The statute which fixes the times when the board may allow claims visits the penalty for its violation upon its violators, the members of the board, and not upon the purchasers of their warrants; and it is not the province of the court to extend the punishment to the innocent. End. Interp. St. § 458. It contains no provision that the allowances made in violation of it or that the warrants issued upon them shall be void. Moreover, in their business transactions, municipal and quasi municipal corporations are governed by the same rules that govern private individuals and corporations. Illinois Trust & Sav. Bank v. City of Arkansas City, 40 U. S. App. 257, 277, 294, 22 C. C. A. 171, 182, 193, and 76 Fed. 271, 282, 293. But neither individuals nor corporations can be permitted to deny, to the damage of others, the truth of statements and representations by which they have purposely or carelessly induced such others to change their situation. There were lawful times and a legal way in which this board of county commissioners could have allowed these claims, and could have issued the warrants upon them. The warrants were representations of the county that they had been issued, and that the claims which they represented had been allowed at those times and in that manner. The plaintiff had the right to put his faith in these representations, and, now that he has invested his money in reliance upon them, it is too late for the county to deny them to his prejudice. A corporation which, by the regularity of the execution of evidences of its debts, which is apparent upon their face, induces lenders or borrowers to loan money upon or to buy them, is thereby estopped from denying their validity or effect on the ground that, in their execution or in the preliminary proceedings which warranted their execution, its officers failed to comply with some law or rule of action relative to the mere time or manner of their procedure with which they might have complied, but which they carelessly or negligently disregarded. Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 10 U. S. App. 98, 188, 191, 2 C. C. A. 174, 239, 241, 51 Fed. 309, 326, 328; Sioux City Terminal Railroad & Warehouse Co. v. Trust Co. of North America, 27 C. C. A. 73, 86, 82 Fed. 124, 137; Board of Com'rs v. Sherwood, 27 U. S. App. 458, 466, 11 C. C. A. 507, 510, and 64 Fed. 103, 108; City of Huron v. Second Ward Sav. Bank, 30 C. C. A. 38, 86 Fed. 272. The county cannot defeat these warrants because they were issued at adjourned or special sessions of the board.

One of the warrants in suit was issued on account of Kearney township scrip, and it is contended that the board of county commissioners had no power to issue warrants for this scrip, because the law under which Kearney township was organized was unconstitutional. Sections 1 and 2 of article 9 of the constitution of Kansas contain these provisions:

"The legislature shall provide for organizing new counties, locating county seats, and changing county lines."

"The legislature shall provide for such county and township officers as may be necessary."

In State v. Board of Com'rs of Pawnee Co., 12 Kan. 426, 438, the supreme court of that state said:

"The whole power of organizing new counties belongs in this state to the legislature. It may provide for their organization by general law, and through the intervention of the governor, or of any other officer, agent, commissioner, or person it may choose; or it may directly organize a new county itself by special act."

The legislature of Kansas provided by general laws for the organization of municipal townships within the counties of that state, and authorized the election or appointment of township officers who were vested with the power to have the care and management of all the property of their township, to superintend the various interests thereof, to care for the poor, to maintain roads, to levy taxes, to incur debts, to allow and disallow claims against the township, and to issue and pay warrants for necessary township purposes. Gen. St. 1889, c. 110. It provided by general laws:

"That so long as any one of the unorganized counties of the state shall be attached to an organized county for judicial purposes, it shall constitute and form one of the municipal townships thereof, and as such shall be entitled to township officers, and all things pertaining to the rights and privileges of a township, and be subject to the same regulations and liabilities as other townships of such county, and its electors shall be deemed legal electors of the county to which it is attached, and the officers of the county to which it is attached shall have the same powers and perform the same duties, in reference to such attached county, as they have over the municipal townships of their own county; * * * that all such school districts within such unorganized county shall be separately described and numbered by the commissioners of such organized county, who shall appoint a deputy school superintendent for this purpose, and also a deputy county surveyor" (paragraph 1610): and "that whenever any unorganized county is attached for judicial purposes to any organized county, it shall be the duty of the county commissioners of the county to which it is attached to order a special election in said unorganized county for the election of township officers; * * * until such election is held, and township officers are elected and qualified, it shall be the duty of the board of county commissioners of such organized county to appoint all necessary township officers for such unorganized county, who shall hold their office until the officers elected at such special election shall have qualified, and the officers elected at such special election shall hold their office till the regular township election" (paragraph 1607).

Under the system of government in Kansas, the essential characteristics of unorganized counties were names and territorial boundaries, only, while organized counties had population, courts, and county officers, in addition to their names and territory. By an act approved March 5, 1887, the legislature of Kansas created Kearney county, and defined its boundaries (chapter 81, Laws 1887), and by another act approved on the same day it provided that "the counties of Stanton and Kearney are hereby attached to the county of Hamilton" (chapter 132, Id.). But the latter act was entitled "An act to attach the counties of Haskell and Kearney to Finney county," and was obnoxious to section 16, art. 2, of the constitution of Kansas, which provides that "no bill shall contain more than one subject, which shall be clearly expressed in its title." Nevertheless, the legislative department of the state of Kansas by the enactment of this law, and the executive department by its approval, treated it as valid. It was published and spread upon the statute books of the state. The board of county commissioners of Hamilton county acknowledged its validity, and under it organized Kearney county as Kearney township, on

April 25, 1887, pursuant to the provisions of the general laws of the state found in paragraphs 1607 and 1610, supra; and from that time until the organization of Kearney county, on April 3, 1888, the township organization existed and acted. During this period of township government, the trustee of the township issued orders on its treasurer for claims against the township allowed by its acting board, pursuant to paragraphs 7085 and 7093, Gen. St. 1889; and after the organization of Kearney county the board of county commissioners allowed these township orders as just claims against the county, and issued for them the warrant in question, which was subsequently purchased by the plaintiff. He brought this action upon it. This case was tried on March 17, 1897. After all these things had been done, and on April 10, 1897, the supreme court of Kansas decided, in an action brought by another party against this county, upon a similar warrant, that the act attaching Kearney county to Hamilton county was unconstitutional and void, and that no recovery could be had on such a warrant, because neither Kearney township nor its officers ever had any existence either de facto, or de jure. Atchison, T. & S. F. R. Co. v. Board of Com'rs of Kearney Co., 48 Pac. 583.

In this state of the case, counsel for the county appeal to the rule, so often announced and enforced in this court, that "the national courts uniformly follow the construction of the constitution and statutes of a state given by its highest judicial tribunal, in all cases that involve no question of general or commercial law, and no question of right under the constitution and laws of the nation." Madden v. County of Lancaster, 27 U. S. App. 528, 536, 12 C. C. A. 566, 570, and 65 Fed. 188, 192. There are, however, two reasons why the decision of the supreme court of Kansas to which we have adverted is not controlling in the case at bar. The first is that it was not rendered until after the rights of the plaintiff were vested under a law which stood unchallenged and without adverse judicial construction when he purchased his warrant. The plaintiff was a citizen of Illinois. He bought this warrant, and thereby entered into a contract relation with the defendant, a citizen of the state of Kansas, before the statute in question had been declared to be void. By this action he acquired the right, under the constitution and laws of the United States, to have his contract interpreted and his rights enforced in a court of the United States, and a fortiori the right to the independent judgment of that court upon the legal questions his case presents. This case falls within one of the recognized exceptions to the general rule which the defendant invokes. That exception is that decisions of the state courts which affect the validity of contracts between citizens of different states which were made, or under which rights were acquired, before there was judicial construction of the constitution or statute which seemed to authorize the contracts, are not obligatory upon the courts of the United States. Burgess v. Seligman, 107 U. S. 20, 27, 2 Sup. Ct. 10; Pleasant Tp. v. Ætna Life Ins. Co., 138 U. S. 67–72, 11 Sup. Ct. 215; Louisville Trust Co. v. City of Cincinnati, 47 U. S. App. 36–47, 22 C. C. A. 334, 339, and 76 Fed. 296, 301; Jones v. Hotel Co., 30 C. C. A. 108, 86 Fed. 370, 373. In Burgess v. Seligman, the supreme court declined to follow a decision of the highest judicial tri-

bunal of Missouri in respect to the interpretation of a statute of that state when the latter decision had been made after the transaction in controversy had arisen. Mr. Justice Bradley, speaking for the unanimous court, said:

"We do not consider ourselves bound to follow the decision of the state court in this case. When the transaction in controversy occurred, and when the case was under the consideration of the circuit court, no construction of the statute had been given by the state tribunals contrary to that given by the circuit court. The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with, and not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that, by the course of their decisions, certain rules are established which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But, where the law has not been thus settled, it is the right and the duty of the federal courts to exercise their own judgment, as they also always do in reference to the doctrines of commercial law and general jurisprudence. So, when contracts and transactions have been entered into, and rights have accrued thereon, under a particular state of the decisions, or when there has been no decision, of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But even in such cases, for the sake of harmony and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts if the question seems to them balanced with doubt. Acting on these principles, founded, as they are, on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the states in controversies between citizens of different states was to institute independent tribunals, which it might be supposed would be unaffected by local prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication. As this matter has received our special consideration, we have endeavored thus briefly to state our views with distinctness, in order to obviate any misapprehensions that may arise from language and expressions used in previous decisions. The principal cases bearing upon the subject are referred to in the note, but it is not deemed necessary to discuss them in detail."

In Louisville Trust Co. v. City of Cincinnati, supra, the United States circuit court of appeals for the Sixth circuit, in treating of this subject, said:

"A well-grounded exception exists where contracts and obligations have been entered upon before there has been any judicial construction of the statutes upon which the contract or obligation depends, by the highest court of the state whose statute is involved. In such a case, if a court of the United States obtains jurisdiction of a question touching the validity, effect, or obligation of such a contract, it will, while 'leaning to an agreement with the state court,' exercise an independent judgment as to the validity and meaning of such contract, although the meaning and validity of state statutes may be an element in the case, and will not be bound to follow opinions

of the state court construing such statute if such decisions were rendered after the rights involved in the controversy originated."

Another reason why the decision of the supreme court of Kansas does not rule this case is that the vital question here is not whether or not the act attaching Kearney county to Hamilton county was constitutional, but it is whether or not the unconstitutionality of that act, if conceded, constitutes any legal defense to an action by an innocent third party upon this warrant; and that is a question of general jurisprudence, which it would be a dereliction of duty for a federal court to decline to consider and determine for itself. Hartford Fire Ins. Co. v. Chicago, M. & St. P. Ry. Co., 36 U. S. App. 152, 156, 17 C. C. A. 62, 65, and 70 Fed. 201, 203, and cases there cited. For these reasons, we have deemed it incumbent upon us to consider and determine the merits of this question; and after its consideration, which we have made with great deference to the opinion of the supreme court of Kansas, we are constrained to say that we have been unable to reach the result which that court has attained. We proceed to state briefly the reasons upon which we rest our conclusion.

The county of Kearney has been the same quasi municipal, political, and corporate entity ever since it was created, in March, 1887. It has during all this time had the same name, the same boundaries, and the same territory. Its inhabitants have undoubtedly changed, but the municipal entity of which they formed a part while they were citizens within its territory has not. It has been said that the particles which compose the human body decay and are replaced by others several times during the average duration of human life; but during all this time each man remains the same identical person, and his rights, duties, and liabilities do not vary with the changing components of his physical organization. In the same way, the inhabitants of a municipal or political subdivision of a state, one by one, die or remove from its territory, and are replaced by others; but the municipal corporation remains unchanged, and its rights and liabilities are not affected by the departure of one and the advent of a succeeding generation of men. The same old commonwealth of Massachusetts exists to-day which was inspired by the life and words, and mourned the loss, of old Samuel Adams, though perhaps no man now survives who lived within its borders during his life. This county of Kearney, then, has been the same quasi municipal body from March, 1887, to the present moment. During about one year of its existence it adopted the name and acted under the title of the township of Kearney. But the township had the same boundaries, the same territory, and the same people as the county of Kearney during its entire existence. During the time while this township of Kearney existed, the legislature of Kansas, which had the power to make counties and townships, the governor of Kansas, who had authority to approve or veto the acts of the legislature, the officers and inhabitants of Hamilton county, and the inhabitants of Kearney county, all supposed that this county of Kearney was the township of Kearney. While the record does not disclose the several acts of the officers and inhabitants of this county during this period, it is conceded on all hands that they acted as a township for nearly 12 months, and it

may have been, and probably is, true, that a township trustee, a township clerk, and a township treasurer were first appointed by the commissioners of Hamilton county, and then elected, under paragraph 1607; that school districts were separately described and numbered; that the schools were supported under the superintendence of the commissioners of Hamilton county, under paragraph 1610; that justices of the peace of the township were chosen, under paragraph 7066; that road overseers were elected, and roads and bridges were repaired and improved, under paragraphs 7070 and 7133; and that the poor of the county of Kearney were supported and cared for by the trustee of Kearney township, under paragraphs 4027, 4046, and 4048 of the General Statutes of Kansas of 1889, for more than 11 months. It may be conceded that if the state or any taxpayer of the county of Kearney had challenged the acts of this township, or of its officers, by a writ of quo warranto, or by an application for an injunction, before public interests were affected and private rights had vested under them, they might have been prevented. But neither the citizen nor the state questioned the lawful existence of this township, or the legality of the acts of its officers, until the life of the former was legally terminated by the organization of the county, and the acts of the latter had all been completed, and the rights of third parties had vested under them. Undoubtedly, the trustee of this township supported the poor, the township board and the road overseers improved and repaired the roads and bridges, and the trustee drew orders on the township treasurer to pay for these repairs and improvements, the children of the inhabitants were taught, on the theory that this was a township; its justices of the peace solemnized marriages, took and certified the acknowledgments of deeds, and decided lawsuits, and its township board audited and allowed accounts, and the trustee issued warrants for them, which strangers purchased, while no one complained,—no one sounded a note of warning. Are all these acts void because every one was mistaken in supposing that Kearney county was attached to Hamilton county? Are the couples married by the justices of this township still single? Are the deeds whose acknowledgments they certified, and the judgments they rendered, void? Are the just claims of those who supported the poor, and repaired the roads and bridges for this county, at the request of these township officers, their allowance by the township board, and the warrants issued for them, all void? And may this county retain the benefits and improvements it has thus obtained, and yet deprive those who furnished them, or those who subsequently purchased its warrants, of all right to a return of the money which they invested in them? We think not. In our opinion, there is an established rule of jurisprudence which prevents results so unjust and deplorable. That principle is that the acts of ordinary municipal bodies into which the people have organized themselves under color of law depend far more upon general acquiescence than upon the legality of their action or the existence of every condition precedent prescribed by the statutes under which they organize and act. It is that general acquiescence by the inhabitants of the political subdivision so organized, and by the departments and officers of the state having official relations with it,

gives to the acts and contracts of a municipal or quasi municipal corporation de facto all the force and validity of the acts of a corporation de jure. The interests of the public which depend upon such municipalities, the rights and the relations of private citizens which become vested and fixed in reliance upon their existence, the intolerable injustice and confusion which must result from an ex post facto avoidance of their acts, commend the justice, and demand the enforcement, of the rule that "when a municipal body has assumed, under color of authority, and exercised, for any considerable period of time, with the consent of the state, the powers of a public corporation, of a kind recognized by the organic law, neither the corporation nor any private party can, in private litigation, question the legality of its existence." National Life Ins. Co. v. Board of Education of City of Huron, 27 U. S. App. 244, 259, 10 C. C. A. 637, 647, and 62 Fed. 778, 787; Ashley v. Board, 16 U. S. App. 656, 671, 8 C. C. A. 455, 461, and 60 Fed. 55, 61; People v. Maynard, 15 Mich. 463, 470; School Dist. No. 25 v. State, 29 Kan. 42, 49, 50; City of St. Louis v. Shields, 62 Mo. 247, 252; State v. Carroll, 38 Conn. 449, 471; State v. Rich, 20 Mo. 393, 396; Clement v. Everest, 29 Mich. 19, 23; Donough v. Hollister, 82 Mich. 309, 46 N. W. 782, 783; Carleton v. People, 10 Mich. 250; Clark v. Com., 29 Pa. St. 129; Com. v. McCombs, 56 Pa. St. 436.

An attempt is made to escape from the effect of this rule on the ground that there can be no de facto corporation under an unconstitutional law; that there can be no such thing as a corporation in fact where the only legal right of such a corporation to exist rests on a law that is clearly void. The effort must, in our opinion, be unavailing in this case—First, because this township was not organized under color of the unconstitutional law, but under color of the general laws of Kansas relating to township organizations; and, second, because the proposition is unsound that there can be no de facto corporation or de facto officer under an unconstitutional law.

If, as in Norton v. Shelby Co., 118 U. S. 425, 6 Sup. Ct. 1121, the corporate body whose acts are in question, and the offices filled by its officers, were unknown to the constitution of the state of Kansas, and if they constituted an anomaly in its system of government,—if under its constitution and laws there could not be a township or township officers under any circumstances, as under the constitution of Tennessee there could not be a board of county commissioners,—in that case the effort of counsel for the county might succeed. But, as we have seen, the legislature of Kansas had authority to create counties and townships when and as it directed. It had provided by general laws when the people of any political subdivision might organize themselves into, and exercise the privileges and franchises of, civil townships. All these laws were constitutional and valid, and it was under these, and not under the void law which enacted the attachment of Kearney county to Hamilton county, that this township was organized, and that its officers were chosen and acted. The law which attempted to attach Kearney county to Hamilton county made no provision for township organization, or for township officers. It cannot therefore be successfully maintained that there was no valid

law authorizing the creation of townships and the choice of township officers, and that for this reason there could be no de facto township and no de facto township officers. There were such laws, and in compliance with them, and under color of them, every step in the organization and operation of this township was taken. The only mistake made was that the citizens and officers supposed that a condition precedent to their action had been complied with, which had not been fulfilled.

In School Dist. No. 25 v. State, 29 Kan. 42, 49, 50, this very question was decided by the supreme court of that state. An unconstitutional law had been passed which purported to detach certain territory from the county of Stafford, and to attach it to the county of Barton. Thereupon, upon the supposition that this law was valid, the county superintendent of Barton county and the inhabitants of a portion of this territory organized a school district, elected officers, and voted for an issue of the bonds of the district to build a school house under the general laws of the state. When an action was brought on the bonds, the trial court held that while the attaching act was void, and the superintendent of Barton county had no authority to organize the school district, yet it was a school district de facto, and its bonds were binding obligations on the de jure district which succeeded. Answering the position urged upon us in the case at bar that there could be no de facto corporation because the attaching act was void, the supreme court said:

"The plaintiff in error (defendant below) claims that school district No. 58 could not have been a de facto organization or school district, because, as it claims, there was no law in existence under which it could have been organized, or could have a legal and valid existence. This, we think, is a mistake. It was organized under the general laws of the state authorizing the creation and organization of school districts (Laws 1876, c. 122, art. 3; Comp. Laws 1879, p. 824 et seq.); and every act that was done or performed with reference to the organization of this school district was done and performed under valid and existing laws. The school district was not organized under the act changing the boundaries of Stafford and Barton counties, for that act made no provision for the organization or creation of school districts. That act said nothing with reference to school districts. But the school district was really and in fact organized and created under said chapter 122 of article 3 of the Laws of 1876, and the bonds were voted and issued under valid and existing laws, and the school-fund commissioners purchased the same under valid and existing laws."

Moreover, we are unable to yield our assent to the broad proposition that there can be no de facto corporation under an unconstitutional law. Such a law passes the scrutiny and receives the approval of the attorney general, of the lawyers who compose the judiciary committees of the state legislative bodies, of the legislature, and of the governor before it reaches the statute book. When it is spread upon that book, it comes to the people of a state with the presumption of validity. Courts declare its invalidity with hesitation and after long deliberation and much consideration, even when its violation of the organic law is clear, and never when it is doubtful. Until the judiciary has declared it void, men act and contract, and they ought to act and contract, on the presumption that it is valid; and where, before such a declaration is made, their acts and contracts

have affected public interests or private rights, they must be treated as valid and lawful. The acts of a de facto corporation or officer under an unconstitutional law before its invalidity is challenged in or declared by the judicial department of the government cannot be avoided, as against the interests of the public or of third parties who have acted or invested in good faith in reliance upon their validity, by any ex post facto declaration or decision that the law under which they acted was void. This proposition is not without the support of eminent authority. Indeed, we believe it is founded in reason, and sustained by the great current of the decisions of the courts that have considered it.

In Ashley v. Board, 16 U. S. App. 656, 666, 671, 8 C. C. A. 455, 461, and 60 Fed. 55, 61, the United States circuit court of appeals for the Sixth circuit held, in a learned and exhaustive opinion, that if a county was organized under an unconstitutional law, and if county bonds were issued and sold by county officers appointed or elected under such a law while they were recognized and treated as such by the inhabitants of the county and by the officials of the state, the invalidity of the law and of the organization would constitute no defense to an action to enforce the collection of the bonds.

In People v. Maynard, 15 Mich. 463, the supreme court of that state refused to inquire, even on a writ of quo warranto, whether a county organization under a law which was claimed to be unconstitutional was invalid, and said:

"In public affairs, where the people have organized themselves under color of law into the ordinary municipal bodies, and have gone on, year after year, raising taxes, making improvements, and exercising their usual franchises, their rights are properly regarded as depending quite as much on the acquiescence as on the regularity of their origin; and no ex post facto inquiry can be permitted to undo their corporate existence. Whatever may be the rights of individuals before such general acquiescence, the corporate standing of the community can be no longer open to question."

In State v. City of Des Moines, 65 N. W. 818, 822, 824, the supreme court of Iowa refused to oust a de facto corporation organized under an unconstitutional law on the ground of acquiescence, although a direct proceeding by quo warranto was brought for the purpose. It declared that color of law was semblance of legal right, and that a corporation organized under an unconstitutional law was organized under color of law.

In State v. Rich, 20 Mo. 393, Rich and another were indicted in the circuit court of Stone county, and a motion was made to quash the indictment on the ground that the law establishing the county of Stone was unconstitutional, so that there was no de jure county and no de jure court. The circuit attorney admitted the unconstitutionality of the law, and the court granted the motion, and dismissed the defendant. The supreme court of Missouri reversed the judgment, and declared that "all such inquiries must be excluded whenever they come up collaterally, and the county, its courts and officers, must be treated as things existing in fact, the lawfulness of which cannot be questioned, unless in a direct proceeding for that purpose." To the same effect is City of St. Louis v. Shields, 62 Mo. 247, 252.

The same rule is applicable to corporations de facto and officers

de facto; and Chief Justice Butler, in the clearest, most analytical, and most satisfactory discussion of this subject which we have found in the books, declares, in State v. Carroll, 38 Conn. 449, 471, that "an officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised: * * * Fourth. Under color of an election or appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such." He cites six cases in which it was held that an officer acting under an unconstitutional law was acting under color of law, and was an officer de facto. They are Taylor v. Skrine, 3 Brev. 516; Cocke v. Halsey, 16 Pet. 71; People v. White, 24 Wend. 520; Carleton v. People, 10 Mich. 250; Clark v. Com., 29 Pa. St. 129; and Com. v. McCombs, 56 Pa. St. 436, in which Judge Strong (afterwards Mr. Justice Strong, of the supreme court) said: "An act of assembly, even if it be unconstitutional, is sufficient to give color of title, and an officer acting under it is an officer de facto." To the position sometimes urged that a law of doubtful constitutionality may give color of law and of title to those who act under it, but that one that is manifestly repugnant to the constitution and void cannot, Chief Justice Butler makes this admirable answer:

"The inference to be drawn from these assumptions necessarily is that a manifestly unconstitutional law is without any force whatever, and that whether manifestly unconstitutional or not, and whether to have the appearance and force of law or not, are questions for the private judgment of the citizen. If these assumptions were true, they would dispose of this case, but they are of novel impression, and fundamentally erroneous. Every law of the legislature, however repugnant to the constitution, has not only the appearance and semblance of authority, but the force of law. It cannot be questioned at the bar of private judgment, and, if thought unconstitutional, resisted, but must be received and obeyed, as to all intents and purposes law, until questioned in and set aside by the courts. This principle is essential to the very existence of order in society. It has never been questioned by any jurist to my knowledge. It was never questioned even by Mr. Calhoun and his disciples that an unconstitutional law of congress, manifestly and palpably unconstitutional, had the color and semblance of authority, and was obligatory upon the citizens of a state, as citizens of the United States, until it was nullified by an act of the state legislature, which they claimed might be done on the ground that the general government was the creature of a compact between the states, and its laws might therefore be so nullified by action of the state legislatures. Certainly, they never asserted that a legislative enactment of a state, having all the forms of law, had not the force of law to all intents and purposes as against the citizens of the state, however repugnant to the state constitution, until set aside by the courts. The doctrine that a law of doubtful constitutionality may be presumed to be constitutional until judicially decided otherwise, and that a law manifestly unconstitutional cannot be so presumed, has no existence as applicable to the citizen."

The conclusion we have reached is that the warrant issued for the scrip of Kearney township cannot be defeated on the ground that the law attaching Kearney county to Hamilton county was unconstitutional: (1) Because the validity of the organization of Kearney township cannot be questioned collaterally in this action; (2) because Kearney township was a de facto township, organized under color of

general laws of Kansas relating to townships, and not under the unconstitutional law which attached Kearney county to Hamilton county; and (3) because, even if it were organized under the unconstitutional law, that law, until it was challenged in or declared void by the judicial department of the government, was sufficient to confer color of legality upon the township; and it was still a de facto organization, whose acts and contracts are valid so far as they involve the interests of the public and of third persons who have relied upon them.

We have now disposed of all the questions presented by this record save one, and that is of minor importance. The trial court peremptorily instructed the jury that they could allow only $12 on a warrant for $788.88 issued to W. J. Price for services as a commissioner. There is nothing in the record to show that the services of this commissioner were not worth more than $12, and nothing by which the amount he is entitled to receive can be accurately determined. No provision of statute has been found which limits his compensation to the amount allowed, and our conclusion is that this instruction was unwarranted. The result of the whole matter is that the judgment below must be reversed, and the cause must be remanded to the court below, with directions to grant a new trial. It is so ordered.